### SEVILLA v. ELIZALDE.
### No. 7323.

United States Court of Appeals for the District of Columbia.

Decided April 15, 1940.

H. L. McCormick and Clair L. Stout, both of Washington, D. C., for appellant.

Harry B. Hawes, Raymond A. Walsh, and Carl L. Ristine, all of Washington, D. C., for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

In this case the appellant, suing as a citizen of the Commonwealth of the Philippine Islands, sought a determination in equity by the District Court of the United States for the District of Columbia that the appellee does not possess the qualifications requisite to holding the office of Resident Commissioner of the Commonwealth to the United States; and the appellant sought an injunction restraining the appellee from exercising the powers of the office mentioned. The trial court, upon a motion of the appellee, dismissed the complaint upon the grounds that it raised a political question over which the court had no jurisdiction, that it showed insufficient interest in the plaintiff to warrant equitable intervention, and that it stated no controversy between the parties. From the order of dismissal this appeal was taken.

As a foundation for the relief sought the appellant's complaint alleged that, under the statute by virtue of which the Commonwealth came into existence—the Independence Act of March 24, 1934 (48 Stat. 456), 48 U.S.C.A. § 1231 et seq., under the Constitution of the Commonwealth and of the Ordinance appended thereto, and under "Chapter 390, Section 4, 48 Stat. 879," 48 U.S.C.A. § 1091, the Resident Commissioner to the United States must be a bona fide elector of the Commonwealth, must owe allegiance to the United States, be more than thirty years of age, able to read and write the English language, and must be appointed

by the President of the Commonwealth with the consent of the Commission on Appointments, a body created by the Constitution.[1] The complaint charged that the appellee does not possess the qualifications mentioned and in particular that the Commission on Appointments had not given its consent to his appointment. Therefore, it was asserted, the exercise by the appellee of the powers or the enjoyment of the privileges or immunities of the office in question would be a usurpation and an encroachment upon the right of the citizens of the Commonwealth to be represented by a Resident Commissioner possessing the requisite qualifications. And it was further charged that at the time of the commencement of the action the appellee was purporting to be the Resident Commissioner of the Commonwealth to the United States, and it was alleged that,

unless it was judicially determined that he had not the lawful right to hold and exercise the office of Resident Commissioner, the appellee would, upon the convening of the United States Congress in January of 1939, attempt to take a seat in the House of Representatives, to participate in the debates of the House, and to enjoy the privileges and immunities ordinarily attaching to the office of a member of the House.

The Independence Act provides, in paragraph 5 of Section 7:

"(5) The government of the Commonwealth of the Philippine Islands shall provide for the selection of a Resident Commissioner to the United States, and shall fix his term of office. He shall be the representative of the government of the Commonwealth of the Philippine Islands and shall be entitled to official recognition

---

[1] The complaint cites "Chapter 390, Section 4, 48 Stat. 879" as authority for its allegation that the Resident Commissioner must be a bona fide elector, owing allegiance to the United States, over the age of thirty, and able to read and write the English language. The statute referred to is an Act of June 5, 1934, amending Section 20 of Chapter 416 of the Act of August 29, 1916, 39 Stat. 545. The Act of August 29, 1916, prescribes the qualifications of the Resident Commissioners under the former Philippine government, prior to the Commonwealth. The Act of June 5, 1934, amends the Act of August 29, 1916, only in respect of the date of the commencement of the term of office of the Resident Commissioners, changing the same from the fourth of March to the third of January. The Act of August 29, 1916, as thus amended, has been superseded by the provisions of the Independence Act and of the Ordinance appended to the Constitution of the Commonwealth, and by the provisions of Commonwealth Act No. 10, First National Assembly, approved December 31, 1935 (Messages of the President, Vol. 1 (Revised Edition, Manila Bureau of Printing, 1938) 177). (Although the Independence Act was approved March 24, 1934, it did not take effect until May 1, 1934, the date of the concurrent resolution of the Philippine Legislature (Messages of the President, id. at 300, Appendix H) accepting the Independence Act in accordance with the provisions of Section 17 thereof; and the new Commonwealth government was not established until November 15, 1935, the date of the promulgation by the Secretary of War of the United States of the proclamation of the President of the United States pursuant to Section 4 of the Independence Act announcing the results of the election of officers provided for under the Constitution. For the text of the President's proclamation see 49 Stat. 3481; and for the text of the promulgation of the proclamation by the Secretary of War see Messages of the President, id. at 311, Appendix J. Until November 15, 1935, therefore, the provisions of the Act of August 29, 1916, as amended by the Act of June 5, 1934, were in effect, although the Independence Act had been approved prior to the date of the June 5, 1934 amendment.) Since the Act of August 29, 1916, as amended, has been superseded by the Independence Act and the Ordinance appended to the Constitution of the Commonwealth, and by the provisions of Commonwealth Act No. 10, above referred to, it obviously has nothing to do with the qualifications of any Resident Commissioner representing the present Commonwealth government.

Under the pertinent provisions of the Independence Act and of the Ordinance appended to the Constitution of the Commonwealth and under the provisions of Commonwealth Act No. 10, the Resident Commissioner to the United States must possess the following qualifications: he must be appointed by the President of the Commonwealth with the consent of the Commission on Appointments of the National Assembly; he must have been a citizen and resident of the Philippines for five years before his appointment, and must be thirty years of age or over and a qualified elector of the Philippines.

as such by all departments upon presentation to the President of credentials signed by the Chief Executive of said government. He shall have a seat in the House of Representatives of the United States, with the right of debate, but without the right of voting. His salary and expenses shall be fixed and paid by the government of the Philippine Islands. . . ." [48 Stat. 462]

And the Ordinance appended to the Constitution of the Commonwealth of the Philippines provides, in Section 2:

"Sec. 2. Pending the final and complete withdrawal of the sovereignty of the United States over the Philippines, there shall be a Resident Commissioner of the Philippines to the United States who shall be appointed by the President of the Commonwealth of the Philippines with the consent of the Commission on Appointments. The powers and duties of the Resident Commissioner shall be as provided in section seven, paragraph five of Public Act Numbered One hundred and twenty-seven of the Congress of the United States, approved March twenty-four, nineteen hundred and thirty-four, together with such other duties as the National Assembly may determine. The qualifications, compensation, and expenses of the Resident Commissioner shall be fixed by law." [Ordinance Appended to the Constitution of the Philippines (Manila Bureau of Printing, 1935), p. 32]

■ The theory of the appellant's complaint is that since under Newman v. United States ex rel. Frizzell, 1915, 238 U.S. 537, 35 S.Ct. 881, 59 L.Ed. 1446, an action at law, in quo warranto, against the putative incumbent of a public office, may not be maintained in the District of Columbia, and since—as the appellant contends—the Congress has no power, the appellee not being a member of Congress, to judge of his qualifications, it necessarily follows that there is a remedy, in equity, to determine whether or not the appellee possesses the qualifications legally requisite to the office of Resident Commissioner, and to oust him from office if the determination is in the negative.

But we think that the appellant's theory overlooks the proposition that "in order to entitle the party to the remedy, a case must be presented appropriate for the exercise of judicial power; the rights in danger . . . must be rights of persons or property, not merely political rights, which do not belong to the jurisdiction of a court, either in law or equity." State of Georgia v. Stanton, 1867, 6 Wall. 50, 76, 18 L.Ed. 721. We think that the trial court properly dismissed the complaint upon the ground that it presented a political, not a judicial, question and one therefore of which the court had no jurisdiction. The other grounds of dismissal it is not necessary to discuss.

■ Courts have no jurisdiction to decide political questions. These are such as have been entrusted by the sovereign for decision to the so-called political departments of government, as distinguished from questions which the sovereign has set to be decided in the courts. Even under a government where there is no express constitutional delegation of powers, this limitation upon judicial authority has long been recognized. It was suggested in The Duke of York's Claim to the Crown, 5 Rotuli Par. 375 (House of Lords, 1460), Wambaugh, Cases on Constitutional Law (1915) 1, 3, where, in respect of the claim of the Duke of York, the "Kyngs Justices" decided that they "durst not enter into eny communication thereof, for it perteyned to the Lordes of the Kyngs blode . . . ." [2] And in Nabob of the Carnatic v. East India Company, 1 Ves.Jr. 371

---

[2] "The matter was thus: On October 16, 1460, the counsel of the Duke of York brought into Parliament a written claim to the crown, desiring speedy answer thereto. It being so resolved, the petition was read, and the chancellor asked what was to be done. The lords answered, 'that the matter was so high and of such wyght, that it was not to eny of the Kynges Subgetts to enter into communication thereof, withoute his high commaundement, agreement and assent had therto.' So all went to the king in person and declared their predicament. He commanded them 'that they shuld serche for to fynde in asmuch as in them was, all such thyngs as myght be objecte and leyde ayenst the cleyme and title of the seid Duc.' The lords, not to be outdone in courtesy, 'besaught the Kyng, that he wuld remember hym, yf he myght fynde any reasonable mater that myght be objected ayenst the seid cleyme and title, in so moche as his seid Highnes had seen and understouden many dyvers writyngs and Cronicles.' Now followed the commission to the judges and their reply: " 'Weruppon . . . the forscid Lordes sent for the Kyngs Justices . . . and in the Kyngs name gave theym straitely

(1791), 2 Ves.Jr. 56 (1793), in which stems a series of authorities in England (see West Rand Central Gold Mining Company, Ltd. v. The King, [1905] 2 K.B. 391), the distinction between judicial and political power was recognized. See also Penn. v. Lord Baltimore, 1 Ves.Sen. 444 (1750). In the United States as early as Ware v. Hylton, 1796, 3 Dall. 199, 260, 1 L.Ed. 568, it was held "incompetent to the examination and decifion of a Court of Juftice" to determine whether a treaty between England and the United States had been broken by one of the parties to it. And from that day until the present time, the decisions in the Federal courts recognize and apply this principle of judicial self-limitation in so-called political cases. Thus courts have refused to: Determine whether or not the constitutional guaranty to every state of a republican form of government has been satisfied;[3] or determine the conditions of peace or war;[4] or determine the beginning and end of war;[5] or determine whether or not aliens shall be excluded or expelled;[6] or determine governmental title to or jurisdiction over a territory;[7] or determine the status of

in commaundement, sadly to take avisament therin, and to serche and fynde all such objections as myght be leyde ayenst the same, in fortefying of the Kynges right.

" 'Whereunto the same Justices . . . for their answere upon the seid writyng to theym delyvered seiden, that they were the Kyngs Justices, and have to determyne such maters as com before theym in the lawe, betwene partie and partie, and in such maters as been betwene partie and partie they may not be of Counseill; and sith this mater was betwene the Kyng and the seid Duc of York as two parties, and also it hath not be accustumed to calle the Justices to Counseill in such maters, and in especiall the mater was so high, and touched the Kyngs high estate and regalie, which is above the lawe and passed ther lernyng, wherfore they durst not enter into eny communication thereof, for it perteyned to the Lordes of the Kyngs blode, and th' apparage of this his lond, to have communication and medle in such maters; and therfore they humble besought all the Lordes, to have theym utterly excused of eny avyce or Counseill, by theym to be yeven in that matier. . . .' " Quoted from Weston, Political Questions (1925) 38 Harv.L.Rev. 296, 302–303; and see the further discussion of this case, pages 303 et seq.

[3] Pacific States Telephone Co. v. Oregon, 1912, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377; Luther v. Borden, 1849, 7 How. 1, 42, 12 L.Ed. 581: "Under this article of the Constitution it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the senators and representatives of a State are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every other department of the government, and could not be questioned in a judicial tribunal. It is true that the contest in this case did not last long enough to bring the matter to this issue; and as no senators or representatives were elected under the authority of the government of which Mr. Dorr was the head, Congress was not called upon to decide the controversy. Yet the right to decide is placed there, and not in the courts."

[4] United States v. One Hundred and Twenty-Nine Packages, D.C.E.D.Mo., 1862, 27 Fed.Cas. 284, 288, No. 15,941: "The condition of peace or war, public or civil, in a legal sense, must be determined by the political department, not the judicial. The latter is bound by the decision thus made."

[5] The Protector, 1871, 12 Wall. 700, 20 L.Ed. 463.

[6] The Chinese Exclusion Case, 1889, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068; The Japanese Immigrant Case, 1903, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L. Ed. 1146: The power to exclude or expel aliens "belongs to the political department of the government . . . . * * * It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter it, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. . . ."

[7] Watts v. United States, 1870, 1 Wash. T. 288; Jones v. United States, 1890, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691; Foster & Elam v. Neilson, 1829, 2 Pet. 253, 309, 7 L.Ed. 415: "After these acts of sovereign power over the territory in

Indian tribes;[8] or recognize the existence of states or governments;[9] or enforce the provisions of a treaty when the sovereign chooses to disregard them;[10] or determine whether a treaty has been terminated;[11] or inquire into the constitutional powers of representatives of foreign nations.[12] While the boundaries of the field of de-

dispute, asserting the American construction of the treaty by which the government claims it, to maintain the opposite construction in its own courts would certainly be an anomaly in the history and practice of nations. If those departments which are entrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in its own courts that this construction is to be denied. A question like this respecting the boundaries of nations, is, as has been truly said, more a political than a legal question; and in its discussion, the courts of every country must respect the pronounced will of the legislature. . . ."

[8] Cherokee Nation v. State of Georgia, 1831, 5 Pet. 1, 8 L.Ed. 25; Kansas Indians, 1866, 5 Wall. 737, 755, 756, 18 L. Ed. 667: "If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a 'people distinct from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. . . . the action of the political department of the government settles, beyond controversy, that the Shawnees are as yet a distinct people, with a perfect tribal organization. . . ."

[9] Rose v. Himely, 1808, 4 Cranch 241, 2 L.Ed. 608; The Nereide, 1815, 9 Cranch 388, 3 L.Ed. 769; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726: "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative— 'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision. [Citing authorities] It has been specifically decided that 'Who is the sovereign, de jure or de facto, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government. This principle has always been upheld by

this court, and has been affirmed under a great variety of circumstances.' . . ."

[10] Botiller v. Dominguez, 1889, 130 U. S. 238, 9 S.Ct. 525, 32 L.Ed. 926.

[11] Ware v. Hylton, supra; Taylor v. Morton, C.C.Mass., 1855, 23 Fed.Cas. 784, 787, No. 13,799, affirmed, 1862, 2 Black 481, 17 L.Ed. 277: "Is it a judicial question whether a treaty with a foreign sovereign has been violated by him [the foreign sovereign] . . . ? I [Curtis, Associate Justice, United States Supreme Court, sitting in circuit] apprehend not. These powers have not been confided by the people to the judiciary, which has no suitable means to exercise them; but to the executive and the legislative departments of our government. They belong to diplomacy and legislation, and not to the administration of existing laws. . . ."

[12] Doe v. Braden, 1853, 16 How. 635, 657, 14 L.Ed. 1090: "And it would be impossible for the executive department of the government to conduct our foreign relations with any advantage to the country, and fulfill the duties which the Constitution has imposed upon it, if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its constitution and laws, to make the engagements into which he entered."

See also on the subject of political questions in the Federal courts: Field, The Doctrine of Political Questions in the Federal Courts (1924) 8 Minn.L.Rev. 485; Weston, Political Questions (1925) 38 Harv.L.Rev. 296. Weston lists the following considerations influencing judicial negation of power: "(a) The fundamental powers and duties in question have distinctly not been delegated to the courts by the Constitution, but rather to the other departments. (b) These fundamental powers and duties are of the sort ordinarily performed by what we understand as political rather than judicial action. The process of legislation is assertion, not decision; foreign affairs are conducted by negotiations, not by pleading and proof; political integrity is maintained by diplomacy or arms, not by injunctions. (c) From another aspect, these powers and duties relate, not to the ordinary matters of law which form the main bulk of controversy between private persons, not to the incidence of the police power upon the workaday world,

cision which lies outside the authority of the courts are not wholly definite—this because the question to which department a power has been delegated is often a difficult problem of interpretation "According as the commission is precise" or "is inexact"[13]—it is not necessary in the instant case to attempt to mark out with precision all points on the boundary, because the instant case clearly falls well within the field of political, rather than judicial action. The Resident Commissioner partakes in part of the characteristics of a diplomatic representative of a foreign power and in part of those of a delegate from a territory. And the determination of the qualifications of such officers lies obviously outside judicial authority and within the field of political action.

As will have been noted from the provisions of the Independence Act which have been set out above, the Resident Commissioner "shall be the representative of the government of the Commonwealth of the Philippine Islands and shall be entitled to official recognition as such by all departments upon presentation to the President of credentials signed by the Chief Executive of said government. . . . His salary and expenses shall be fixed and paid by the government of the Philippine Islands." Moreover the political organization which the Resident Commissioner represents itself presently partakes—during the interim period between the coming into existence of the Commonwealth and the date when it may in the manner provided in the Independence Act acquire complete independence[14]—in some part of the characteristics, under international law, of a state.[15] It has a people per-

---

but to the maintenance, furtherance, and functioning of government, to the exigencies of the state's existence, external and internal. (d) In every instance where a question of fact is to be decided, it is one which the persons executing the power or performing the duty must decide as the very basis of their own not merely ministerial conduct. (e) In those matters which relate to foreign affairs and to military action abroad and at home, the circumstances will often be such as to leave no chance to await the result of test litigation, while the consequences of the action may be so far-reaching that any uncertainty as to its validity becomes intolerable. (f) Other practical considerations come to the fore, which we cannot assume were not adverted to by the framers of the Constitution and which are indicated upon the face of that instrument itself. Unity; certainty; respect and orderliness; efficiency; all are desiderata." 38 Harv.L.Rev. at 327-8.

[13] "According as the commission is precise, there is less room for a confusion of the various senses of 'judicial' or 'political' in connection with any given problem of the division of power. According as the commission is inexact, there is more opportunity for such confusion, but the confounding is none the less unjustified in legal thought. Judicial questions, in what may be thought the more useful sense, are those which the sovereign has set to be decided in the courts. Political questions, similarly, are those which the sovereign has entrusted to the so-called political departments of government or has reserved to be settled by its own extra-governmental action. As to the courts, the question is always the

same, whether the method has been that of clear express delegation at the outset of a court's creation, or that of obscure delegation through a centuries-long process, in part of authority given in advance, and in part of approval, express or tacit, given in arrears of jurisdiction already assumed. . . . The problem is one of interpretation in a very well understood sense, and it is only the factors of interpretation which will be for the moment in doubt. . . ." Weston, Political Questions, id. at 301.

[14] Sec. 10. (a) of the Independence Act provides that "On the 4th day of July immediately following the expiration of a period of ten years from the date of the inauguration of the new government under the constitution provided for in this Act, the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands . . . and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force." As explained in footnote 1, the new Commonwealth government was established November 15, 1935. Under present laws, therefore, the Philippine Islands will achieve complete independence July 4, 1946.

[15] According to the Independence Act (and the Constitution and Ordinance adopted pursuant thereto): All property

manently occupying a fixed territory, bound together by common laws into a body politic, with an organized government exercising powers within the territory and capable, subject to limitations mentioned below, of entering into relations with other states. See 1 Hyde, International Law (1922) § 7; 1 Moore, International Law Digest (1906) § 3. The Commonwealth does not fully satisfy the definition of a state at international law because it does not possess independent treaty making power by virtue of which it may enter into direct relations with other powers.[16] But to the extent that the Commonwealth is like a foreign state, its Resident Commissioner is like a diplomatic representative.

But the Resident Commissioner partakes also of the characteristics of a delegate from a dependent territory. By virtue of paragraph 5 of Section 7 of the Independence Act, above set forth, "He shall have a seat in the House of Representatives of the United States, with the right of debate, but without the right of voting." And although the government which he represents has, as just demonstrated, in some part the characteristics of a foreign state, it also has some of the characteristics of a dependent territory.[17]

■ The law is settled that the courts have no jurisdiction to pass upon the qualifications of a diplomatic representative of a foreign power. Section 3 of Article II of the United States Constitution express-

---

rights which have been acquired by the United States government in the Philippines are granted to the government of the Commonwealth (except certain properties reserved for military and other purposes) (Sec. 5.). The Commonwealth is obliged to assume and pay the obligations of the old government of the Philippines (Sec. 2. (a) (7)). The United States is relieved from any liability to meet obligations of the Commonwealth which come into existence during the interim period (Sec. 9). The Philippines are to be considered a "separate country" for the purposes of immigration, and for the same purposes the citizens of the Philippines are to be considered aliens (Sec. 8. (a) (1)). A foreign service officer of the United States stationed in the Philippines "shall be considered as stationed in a foreign country" (Sec. 8. (a) (3)). The Commonwealth, subject to the final approval of the President of the United States has power to enact laws affecting currency, coinage, imports, exports and immigration (Sec. 2. (a) (9)). The Commonwealth, subject to the approval of the President of the United States, may contract loans in foreign countries (Sec. 2. (a) (6)). And, subject to the supervision and control of the United States the Commonwealth is to have foreign affairs (Sec. 2. (a) (10)).

16 For a discussion of the "semi-sovereign" political status of the Commonwealth government during the interim period, see Fisher, The Status of the Philippine Islands under the Independence Act (1933), 19 Am.Bar Ass'n J. 465.

17 According to the Independence Act (and the Constitution and Ordinance adopted pursuant thereto): All citizens and every officer of the Commonwealth government shall owe allegiance to the United States (Sec. 2. (a) (1), (2)). All acts passed by the Legislature of the

Commonwealth shall be reported to the United States Congress (Sec. 2. (a) (11)). The United States has the right to expropriate Philippine property for public uses, to maintain military reservations and armed forces in the Philippines, and to call into service all military forces organized by the Commonwealth government (Sec. 2. (a) (12)). Decisions of the courts of the Commonwealth are subject to review by the Supreme Court of the United States (Sec. 2. (a) (13)), and appeals from the decisions of the insular auditor may be taken to the President of the United States (Sec. 7. (4)). Citizens and corporations of the United States shall enjoy in the Philippines all the rights of citizens and corporations thereof (Sec. 2. (a) (16)). The Constitution of the Commonwealth when drafted was subject to the final approval of the President of the United States (Sec. 3.) and until final withdrawal of the United States sovereignty every amendment to the Constitution is to be submitted to the President of the United States for approval (Sec. 7. (1)). The President of the United States has authority to suspend the taking effect of any law, contract or executive order of the Commonwealth which in his judgment will result in the failure of the government to fulfill its contracts, or to meet its financial obligations, or which in his judgment will violate international obligations of the United States to other powers (Sec. 7. (2)). The Chief Executive of the Commonwealth shall make annual reports to the President and Congress of the United States (Sec. 7. (3)). The United States High Commissioner is given access to all records of the Commonwealth government and must be furnished by the Chief Executive of the Commonwealth with such information as he requests (Sec. 7. (4)).

ly delegates to the executive branch of the government the power to receive ambassadors: the President "shall receive ambassadors and other public ministers . . . ." From this it follows that in him is the authority to determine the authenticity of the credentials of diplomatic representatives, and whether this government will recognize them as the qualified representatives of a foreign power.

In Re Baiz, 1890, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222, an action was commenced in the United States District Court for the Southern District of New York to recover damages for the publication by one Baiz of an alleged libel. Upon the ground that this had been published in the course of his representation of the Republic of Guatemala and that in this diplomatic status he was a privileged person, Baiz applied to the Supreme Court for a writ of prohibition to restrain the District Court from exercising jurisdiction. Correspondence between Baiz and the Secretary of State of the United States showed that the State Department had refused to recognize him as an accredited representative of Guatemala. The Supreme Court held, therefore, that the District Court had jurisdiction and refused to issue the writ. It accepted as final and binding upon the courts the refusal of the State Department to recognize Baiz. The Court said:

"We ought to add that while we have not cared to dispose of this case upon the mere absence of technical evidence, we do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister, and therefore have the right to accept the certificate of the State Department that a party is or is not a privileged person, and cannot properly be asked to proceed upon argumentative or collateral proof." [135 U.S. at pages 431, 432, 10 S.Ct. at page 862, 34 L.Ed. 222]

Again in Agency of Canadian Car & F. Co. v. American Can Co., 2 Cir., 1919, 258 F. 363, 6 A.L.R. 1182, it appeared that in 1917 the Russian government had, through officials recognized by the United States government, assigned to the plaintiff Agency all of its interest in certain claims due from the defendant American Can Company. These claims had matured and were the subject of the suit. The defendant raised, among other questions, one as to whether the officials who executed the assignment for the Russian government authentically represented it. The court held that it would not assume to examine into this question for the reason that "who represents and acts for a foreign sovereign or nation in its relation with the United States is determined, not by the judicial department, but exclusively by the political branch of the government," and held that the authority of the officials in question was conclusively established for the court by the fact of their recognition by the United States government. This point was decided upon the authority of In re Baiz, supra. To the same effect see The Rogday, D.C.N.D.Cal., 1920, 279 F. 130.

We think it clear also that the courts have no authority to pass upon the qualifications of a delegate from a territory. Article I, section 5 of the Constitution provides that "each house shall be the judge of the elections, returns, and qualifications of its own members . . . ." And the Supreme Court has recognized that although these powers are judicial, as distinguished from legislative or executive, in type, they have nevertheless been lodged in the legislative branch by the Constitution. In Barry v. United States ex rel. Cunningham, 1929, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867, an inquiry was instituted by the United States Senate, through a committee thereof, into the validity of the election of a Senator from Pennsylvania. In respect of the committee's action in ordering a witness taken into custody for contumacy, the question whether the Senate was engaged in an inquiry which it had constitutional power to make, was presented to the Supreme Court in a habeas corpus proceeding. The Court ruled that it was, saying:

". . . Generally, the Senate is a legislative body, exercising in connection with the House only the power to make laws. But it has had conferred upon it by the Constitution certain powers which are not legislative but judicial in character. Among these is the power to judge of the elections, returns and qualifications of its own members. Art. I, § 5, cl. 1. . . . Exercise of the power necessarily involves the ascertainment of facts, the attendance of witnesses, the examination of such witnesses, with the power to compel them to answer pertinent questions, to determine the facts and apply the appropriate rules of law, and, finally, *to render a judgment which is beyond the authority of any other*

*tribunal to review. . . .*" [279 U.S. at page 613, 49 S.Ct. at page 455, 73 L.Ed. 867] [Italics supplied]

See also the remark in Keogh v. Horner, D.C.S.D.Ill., 1934, 8 F.Supp. 933, 935, that "the power of the respective Houses of Congress with reference to the qualification and legality of the election of its members is supreme. . . . this court has no authority to be the judge of the manner in which such members were elected. . . ." And see Note (1937) 107 A.L.R. 205, 206.

We are cited to no cases, and we find none, in which the Federal courts have even been asked to determine the qualifications of a member of Congress. Apparently it has been fully recognized that that power is lodged exclusively in the legislative branch. Under parallel provisions in state constitutions giving state legislatures the power to determine the qualifications of their members, it is ruled that the legislative power is exclusive—that the courts have no jurisdiction. Reif v. Barrett, 1933, 355 Ill. 104, 188 N.E. 889; Greenwood v. Board of Registrars of Voters of City of Fitchburg, 1933, 282 Mass. 74, 184 N.E. 390; Dinan v. Swig, 1916, 223 Mass. 516, 112 N.E. 91; Covington v. Buffett, 1900, 90 Md. 569, 45 A. 204, 47 L.R.A. 622; Attorney General v. Board of Canvassers of Seventh Senatorial District, 1908, 155 Mich. 44, 118 N.W. 584; Dalton v. State, 1885, 43 Ohio St. 652, 3 N.E. 685; and see Note (1937) 107 A.L.R. 205, 209.

It is patent, of course, that the Resident Commissioner of the Philippines is not in a full sense of the term a "member of Congress." Neither, however, are delegates to Congress from the various territories. They, like the Resident Commissioner, have some but not all of the characteristics of members, i. e., they have a seat, and they may participate in debate, but they may not vote.[18] In Territory ex rel. Sulzer v. Canvassing Board, 1st Div., 1917, 5 Alaska 602, there was a petition in the territorial court brought by the Territory of Alaska on the relation of one Sulzer for an alternative writ of mandamus, to compel a Canvassing Board to reject the alleged votes from certain precincts for the office of delegate to Congress from Alaska, or to issue to Sulzer a certificate of election. The petition was granted, the court holding that mandamus was the proper remedy to compel the Canvassing Board to issue a certificate. But the court recognized that "this certificate of election is not final. The House of Representatives is the tribunal before which the contest of election comes. . . . it is clothed with plenary power to seat whomsoever it pleases—certificate or no certificate." (5 Alaska at pages 631–632) And Congress has, in respect of persons claiming a right to sit as delegates from territories, consistently claimed and exercised power to determine their qualifications. See for example: The Florida Election Case of David Levy, 1 Hinds, Precedents of the House of Representatives (1907) 394 (1841); The Utah Election Case of Campbell v. Cannon, id. at 500 (1882).

We do not assume to rule, because it is not necessary to do so, whether the action of the executive department alone is conclusive of the qualifications of the Resident Commissioner—because he partakes in some part of the characteristics of a diplomatic representative and presents his credentials to the President; or whether the action of the legislative department alone is conclusive of his qualifications—because he partakes in part of the characteristics of a delegate; or whether the ultimate authority to determine the Resident Commissioner's qualifications is in the joint action of the two political departments. It is sufficient for the determination of this case that, under the Constitutional provisions, judicial decisions and reasoning above set forth, the power to determine the qualifications of the Resident Commissioner is exclusively in either the President or the House of Representatives, or both, as political departments of the government, and not in the courts.

Affirmed.

[18] In respect of the powers of various delegates to Congress see the following: Act of May 7, 1906, c. 2083, § 1, 34 Stat. 169, 48 U.S.C.A. § 131, and Rev.Stat. § 1862 (1873–4)—Alaska; Act of April 30, 1900, c. 339, § 85, 31 Stat. 158, as amended by the Act of June 28, 1906, c. 3582, § 85, 34 Stat. 550, 48 U.S.C.A. § 651—Hawaii.