## TROST v. TOMPKINS.
### No. 296.

Municipal Court of Appeals for the
District of Columbia.
Oct. 11, 1945.

George A. Cassidy, Jr., of Washington D. C. (Frederick Stohlman, of Washington, D. C., on the brief), for appellant.

John Dillon Fitzgerald, of Washington, D. C., for appellee.

Before RICHARDSON, Chief Judge, and CAYTON and HOOD, Associate Judges.

## RICHARDSON, Chief Judge.

Appellant is Assistant Commissioner for Shipping and Immigration of the Royal Yugoslav Government. He is living in Washington, engaged in representing the interests of his Government before the "Inter-Allied Shipping Pool." Being sued for possession of rented premises which he has continued to occupy after expiration of his lease from the owner, he claimed diplomatic immunity from suit. This plea the trial court denied. Judgment was then entered from which he has appealed.

At the trial it was conceded that the owner was entitled to possession. That she sought possession in good faith for her personal use as living quarters was therefore admitted.[1] The only issue was whether her rights could be judicially enforced in view of appellant's claim of immunity.

The record before us contains no information as to the composition or functions of the Inter-Allied Shipping Pool.

We take judicial notice that the Government of the United States has no connection with it and that it does not exist as an agency of our government, and is not created by an agreement to which the United States is a party.

Appellant testified that he does not occupy a diplomatic post, by which we infer he correctly assumed that in representing his government before the Inter-Allied Shipping Pool, which he stated was his business in this country, he was not engaged in its behalf in transactions with the Government of the United States. He stated, however, that he occupies office space in the Yugoslavian Embassy, that his work is supervised by the ambassador, and that his name appears in the "White List" circulated by the Department of State.

We are furnished no details of appellant's duties or of the services he performs other than may be implied by his statement that he represents his government before the "Pool." His superior, the "Commissioner for Shipping and Immigration" resides in London. What supervision the ambassador exercises is not shown.

The "White List," so-called to distinguish it from the "Blue List" of diplomatic officers and members of their families, is issued monthly by the State Department. It is prepared by the Assistant Chief of the Protocol Division and contains names furnished by the various embassies and legations in response to letters requesting the names of their employees and domestic servants. Apparently, without investigation or verification, these names (with a notation of the character of employment and address) are then included in a mimeographed list entitled "List of Employees in the Embassies and Legations in Washington Not Printed in the Diplomatic List." A copy is transmitted to the United States Marshal for the District of Columbia, the process serving officer in this jurisdiction. In the list produced in evidence, in the section entitled "Yugoslavia," among names of persons classified as "Chancellor," "Adviser," "Clerk," "Stenographer," appears the item: "Mr. Slavoy (Slavoj) Ivan Trost, Assistant Commissioner for Shipping and Emigration, 2031 New Hampshire Avenue."

The information as to the preparation of the "White List" was furnished by the Assistant Chief of the Protocol Division of the State Department, who testified as

---

[1] Emergency Rent Act, Code 1940, § 45—1605(b) (2).

a witness for appellant and identified the list in evidence. She did not appear in behalf of or claim to represent the Department.

. Our legislation directly dealing with the subject of diplomatic immunity from judicial process is comprehended within the sections of the United States Code we insert in the margin.[2] Except for minor changes in wording these code sections reproduce Sections 25, 26 and 27 of the Act of Congress of April 30, 1790, 1 Stat. L. 117, entitled "An Act for the Punishment of certain Crimes against the United States." As the title indicates, the intent was to impose criminal sanctions upon those who violated certain privileges and immunities of ambassadors and public ministers, their "domestics and domestic servants"; not to define or limit the application of the principles of international law to which our nation, in its relations with other powers, must conform.

The Act of 1790 was a substantial copy of the British Statute of 1708 (7 Anne, ch. 12), an emergency measure intended to relieve the strained relations with the Russian Government resulting from the failure to penalize the persons responsible for the arrest of the Russian Minister in an action for debt, which, although a breach of international law, was not punishable as an offense under then existing British law.[3]

Following a comprehensive review of our legislation affecting diplomatic representatives, in delivering the opinion of the Supreme Court in the case of In re Baiz, 135 U.S. 403, 10 S.Ct. 854, 858, 34 L.Ed. 222, Chief Justice Fuller, speaking of these sections of the Act of 1790, said that they: "were drawn from the statute 7 Anne, c. 12, which was declaratory simply of the law of nations, which, Lord Mansfield observed in Heathfield v. Chilton, 4 Burrows 2016, the act did not intend to alter and could not alter."

■ It follows, therefore, that in deciding whether appellant was entitled to maintain his claim of diplomatic immunity we must be governed by those rules and principles of international law recognized and supported by precedent of court decision or executive action in our own and other nations.

I.

Effect of Inclusion of Appellant in State Department "White List."

Does the fact that Trost's name is included on the "White List" foreclose judicial inquiry? We find no case wherein the status of this list has been considered and

---

2 22 U.S.C.A.:

"Sec. 252. Suits against ministers and their domestics prohibited. Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, or any domestic or domestic servant of any such minister, is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void.

"Sec. 253. Penalty for wrongful suit. Whenever any writ or process is sued out in violation of section 252 of this title, every person by whom the same is obtained or prosecuted, whether as party or as attorney or solicitor, and every officer concerned in executing it, shall be deemed a violator of the laws of nations and a disturber of the public repose, and shall be imprisoned for not more than three years, and fined at the discretion of the court.

"Sec. 254. Exceptions as to suits against servants, etc., of minister; listing servants. Sections 252 and 253 of this title shall not apply to any case where the person against whom the process is issued is a citizen or inhabitant of the United States in the service of an ambassador or a public minister and the process is founded upon a debt contracted before he entered upon such service; nor shall section 253 of this title apply to any case where the person against whom the process is issued is a domestic servant of an ambassador or a public minister, unless the name of the servant has, before the issuing thereof, been registered in the Department of State, and transmitted by the Secretary of State to the marshal of the District of Columbia, who shall upon receipt thereof post the same in some public place in his office. All persons shall have resort to the list of names so posted in the marshal's office, and may take copies without fee."

3 The Case of Andrew Artemonowitz Matteuof, Ambassador of Muscovy, 10 Mod. 4, 88 Eng.Reports (Reprint) 598; 1 Blackstone's Commentaries, 255.

must be governed factually in our decision by the record before us.

■ We recognize the importance of the rule that diplomatic immunity is essentially a political question; that considerations of policy, often involving delicate relations between our government and friendly powers, are so potent that courts properly refuse to look beyond a determination by the executive branch of government.[4]

In the case of Báiz, quoted supra, the court, citing communications from the Secretary of State to the petitioner advising him that the department did not regard his designation as chargé de affaires of the Legation of Guatemala as conferring diplomatic immunity, said: "This correspondence disposes of the question before us." And in concluding its opinion the court expressed the rule by which we are to be guided: " * * * we do not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister, and therefore have the right to accept the certificate of the state department that a party is or is not a privileged person, and cannot properly be asked to proceed upon argumentative or collateral proof."

But is the "White List" equivalent to a certificate from the Secretary of State? The only statutory authority we find for the preparation of the so-called "White List" is contained in Code Section 254, originally Section 27 of the Act of 1790. In view of the English cases hereinafter cited it is important to note that this section is taken from the corresponding section of the Statute of Anne.

The provision is that Section 253, which imposes certain penalties, may not be invoked where the person against whom process is issued is a domestic servant "unless the name of the servant has, before the issuing thereof, been registered in the Department of State and transmitted by the Secretary of State to the marshal of the District of Columbia, who shall upon receipt thereof post the same in some public place in his office."

The plain implication of the language used is that to secure the protection of his servants, the ambassador or minister must register them, i. e., furnish their names to the State Department, and thereupon it becomes the duty of the Secretary of State to transmit the names so "registered" to the marshal. Register is defined as to record; "to enter formally in a register; cause to be so entered by a person charged with making such entries." (The New Century Dictionary). It does not imply the investigation and ascertainment of the verity of the facts furnished for registration. The duty to be performed is purely ministerial and the purpose is confined to furnishing notice to the public for its protection against the incurring of criminal liability for what might otherwise be an unintentional violation of the Act.

Apparently here, as in England, the large increase in the number of clerical and other nondiplomatic employees other than servants has as a matter of convenience led to the inclusion of all employees in the lists called for by the Department and transmitted to the marshal as provided in Section 254 in the form we now term the "White List." The practice in England has closely paralleled that of our own Department of State, although in that country it appears that the names furnished by the foreign representative are the subject of inquiry. In the opinion in Engelke v. Musmann, supra, we find it stated that "after investigation it not infrequently happens that recognition is withheld from a person whose name appears upon the furnished list." Notwithstanding this, however, the court was not concluded by the fact that the name of an individual for whom diplomatic immunity was claimed appeared on the list. In this case, in considering the status of a consular secretary of the German Embassy, the court referred to that clause of the Statute of Anne which, as here, furnished the original basis for preparation of such a list and said:

"This, of course, is a negative provision and does not show that the list should be accepted as evidence; but it does contemplate the preparation of a list of people for whom immunity is claimed and its publication in the manner therein provided. The list is not conclusive, nor is it the list itself on which reliance is to be placed, but on the statement of the Crown, speaking through the Attorney-General, stating that a particular person at the critical moment is qualified to be upon the list."

■ While appellant does not come within the class of domestic servants specifically mentioned in Section 254 of our

---

[4] Engelke v. Musmann, 1928 A.C. 433.

statute, we think that for the purposes of this case the furnishing of his name by his ambassador to the State Department and its inclusion by the Department on the list transmitted to the marshal for the District of Columbia imports no more extensive legal implications than had he been one of the designated class. And since his status and right to immunity have not been determined by executive action, they were in our opinion, proper subjects for decision by the trial court.

## II.

### Right to Immunity Based on Exercise of Diplomatic Functions.

■ Appellant's official position in his government is not decisive of his right to enjoy immunity from suit in our courts. Incumbents of civil offices in a foreign government, while attached to an embassy in positions having relation to the functions of the ambassador as the representative of his nation to the Government of the United States, as do others so employed, derive their right to immunity solely as members of the official or domestic household of the ambassador. Whether secretaries, military attaches, clerks, or domestic servants, their service must further and be related to the functions of the ambassador as the emissary of his country to our own. Their duties, even when merely social or personal, must contribute to the efficient performance of the important diplomatic duties of the recognized representative of a friendly state. But government officials, present here to transact business with private persons or organizations not connected with our government, have no immunity. Nor does the fact that they are provided an office in the embassy building and that their work is supervised by the ambassador extend his immunity to them. In this respect the latter's action is but an instance, not unusual, of the exercise of a nondiplomatic function by a diplomatic representative.

■ The generally accepted limitation to the rule of diplomatic immunity is that it extends only to ambassadors or ministers who are the representatives of one state to another. Their diplomatic function is the transaction of business between the government by which they are sent and that to which they are accredited. This is inherent in the origin and bases of the doctrine. Long before permanent representatives were maintained at foreign capitals, a practice originating in the Sixteenth Century, the sending of ministers upon special missions was the only means of intercommunication between nations in peace or at war. For centuries representatives so engaged have been entitled to safe conduct to and from their country,[5] even in those lands through which they must pass.[6]

In a recent Federal case it was said that: "this immunity has not been extended to the officers or crew of foreign warships (citations) nor to consuls or vice consuls (citations) nor to any officers, agents, or employees of a foreign sovereign ruler or sovereign state other than those entrusted to negotiate between foreign states such as ambassadors and other diplomatic representatives of the foreign state (citations). It never has been held that every one acting on behalf of a foreign state enjoys immunity from suit."[7]

Sir Cecil J. B. Hurst, legal adviser to the British foreign office, expressed the same opinion. He said:

"If the representative is called upon by his own sovereign to perform functions other than those of maintaining relations with the sovereign to whom he is accredited, the purpose with which the latter acquiesces in his non-subjection to the local jurisdiction ceases to be operative in respect of those functions. The extra-territoriality or non-subjection to the local jurisdiction enjoyed by a member of a foreign diplomatic mission is, therefore, due not to the fact that he is engaged on the business of a foreign Government, but to the fact that he is a part of the machine for maintaining relations between two Governments."[8]

[5] When David sent messengers to Hanun, King of the Ammonites, to "comfort" him concerning the death of his father, they were subjected to indignities, because of which David sent his army to destroy the Ammonites. 1 Chronicles, Ch. 19.

[6] Holbrook Nelson & Co. v. Henderson, 6 N.Y.Super. 619, 4 Sandf. 619; Wilson v. Blanco, 56 N.Y.Super. 582, 4 N.Y.S. 714.

[7] United States v. Deutsches Kalisyndikat Gesellschaft, D.C.S.D.N.Y., 31 F. 2d 199, 203.

[8] Hurst, Diplomatic Immunities—Modern Developments, 10 British Year Book of International Law, 1929, p. 4.

And speaking of those employed in subordinate capacities, he continued:

"Friction can only be avoided if there is on both sides recognition of the controlling principle. That I conceive to be that in order to be entitled to the privilege a member of the staff must be working under the direct control and orders of the head of the mission *in his diplomatic capacity,* that is to say, he must be concerned with the work of the head of the mission as the channel of communication with the Government to which he is accredited, and not concerned only with non-diplomatic work which the Government may entrust to the head of the mission."

In Engelke v. Musmann, supra, the Attorney General, in support of Engelke's right to immunity, filed the report of the British foreign office holding that Engelke was entitled to diplomatic immunity. It was shown that while concerned with the duties of consular secretary, Engelke had been obliged to take part from time to time in the general work of the embassy staff. This met the test applied by the British Foreign Office.

Barbuit's case (1735) 25 Eng.Reports (Full Reprint) 777, is of particular interest in that it was an interpretation by the Lord Chancellor of the language of the then recently enacted Statute of Anne; also because it expresses a concept of the basis of diplomatic immunity which we may regard as a heritage no less constraining than our acceptance of the common law of England as the foundation of our jurisprudence.

The Lord Chancellor said:

"The privilege of a public minister is to have his person sacred and free from arrests, not on his own account, but on account of those he represents, and this arises from the necessity of the thing, that nations may have intercourse with one another in the same manner as private persons, by agents, when they cannot meet themselves."

And referring to the Statute of Anne:

"I do not think the words *ambassadors,* or *other public ministers,* are synonymous. I think that the word *ambassadors* in the Act of Parliament, was intended to signify ministers sent upon extraordinary occasions, which are commonly called *ambas-* *sadors extraordinary;* and *public ministers* in the act take in all others who constantly reside here; and both are entitled to these privileges. * * * It has long been said, that to make him a public minister he must be employed about state affairs. In which case, if state affairs are used in opposition to commerce, it is wrong; but if only to signify the business between nation and nation the proposition is right; for, trade is a matter of state, and of a public nature, and consequently a proper subject for the employment of an ambassador. In treaties of commerce those employed are as much public ministers as any others. * * * But what creates my difficulty is, that I do not think he is intrusted to transact affairs between the two crowns."

Referring to the holding that Barbuit was not entitled to immunity because he "was not intrusted to transact affairs between the two crowns," and reviewing Engelke v. Musmann, supra, and other cases, Montell Ogdon makes the following comment:[9]

"What, then, according to these cases, is the purpose for which these immunities are recognized? It is to enable the members of a foreign mission to act effectively as the representatives of their own sovereign in the maintenance of relations with the sovereign to whom they are accredited, said Sir Cecil. It is not to enable them to fulfill tasks lying outside of diplomatic activities. This test if applied to the member of a diplomatic mission or to any person claiming immunity should determine whether there is an obligation to allow the privilege."

■ On the record before us, largely appellant's own testimony, the only work on which he is engaged is a matter extrinsic to the diplomatic functions of the ambassador, and it does not, in our opinion, entitle him to diplomatic immunity.

■ The delicacy of the question, involving as it does the relations of our government with a friendly foreign nation, is such that the absence of a decision by the executive department charged with responsibility for the conduct of our affairs abroad, is to be regretted. The usual rule is that "Courts have no jurisdiction to decide political questions."[10] But where, as here, the issue is raised as an affirmative defense in an action over which the court

9 Ogdon, Montell, Juridical Bases of Diplomatic Immunity, 1936, pp. 189–191.

10 Sevilla v. Elizalde, 72 App.D.C. 108, 112 F.2d 29.

has jurisdiction and there is no executive ruling, the situation requires judicial determination.

### III.

### Appellant's Right to Plead Immunity.

■ May the employee or domestic servant when sued plead diplomatic immunity in his own behalf? We find no case in this country where the question has been considered. In England it is held that where the matter is at all in doubt the claim must be made by the ambassador. The reason assigned is that "The immunity of a servant is the privilege of the ambassador, not of the servant." [11] In cases bearing a close analogy, our courts have required the intervention of the recognized representative of the nation involved.

In Compania Espanola De Navegacion Maritima, S. A. v. The Navemar, 303 U. S. 68, 58 S.Ct. 432, 434, 82 L.Ed. 667, the court conceded that property of a sovereign state, in its possession and use, "is immune from suit in the courts of admiralty of the United States." But the claim may not be made by the custodian of the property or other inferior agent. Chief Justice Stone, delivering the opinion of the Court, described the requisite procedure as follows:

"If the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction. (Citations.) The foreign government is also entitled as of right, upon a proper showing, to appear in a pending suit, there to assert its claim to the vessel, and to raise the jurisdictional question in its own name or that of its accredited and recognized representative."

In Piascik v. British Ministry of War Transport, D.C.S.D.N.Y., 54 F.Supp. 487, the court said that the rule applicable to actions in rem was equally appropriate to actions in personam.

The same was held in Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc., D. C. S.D.N.Y., 300 F. 891, 893, where defendant claimed that as the agent of a sovereign state it was immune from suit. Judge Learned Hand, after reviewing the authorities, said:

"When the party before the court as claimant or as defendant is neither the sovereign nor his ambassador, it is now the established rule that the claim will not be recognized, unless by diplomatic intervention."

In affirming, the Circuit Court of Appeals said:

"The government must claim immunity for its agent, and should do so in as formal a manner as when government property is seized." [12]

Here appellant's claim to immunity is not supported by appearance or representation of his government or of our own.

Under facts substantially identical with those appearing here, one Kite, an employee of our embassy at Rome, was sued for the recovery of a leased apartment. Admittedly entitled to immunity from suit, his case was brought to the attention of the State Department by the request of the ambassador for instruction. The Department conceded his right to immunity, but added:

"At the same time you will instruct Mr. Kite that if Signora Comina is acting in accordance with the provisions of the Italian law in demanding the possession of her premises, he is not to seek to avoid the consequences of the law by recourse to his character as an employee of the Embassy." [13]

This illustrates concretely the subordination of the employee to the will of his superior in claiming diplomatic immunity.

For the several reasons stated we agree with the conclusion of the trial court.

Affirmed.

---

[11] Fisher v. Begrez, 1883, 2 C. & M. 240.

[12] Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc., 2 Cir., 32 F.2d 195, 200.

[13] Hackworth, Vol. IV, p. 549, quoting U. S. Department of State, file 701/101.