**UNITED STATES of America**

v.

**Igor Y. MELEKH, also known as Peter Stephens and also known as "Gipsy," and Willie Hirsch, also known as John Gilmore, Defendants.**

United States District Court
S. D. New York.
Nov. 28, 1960.

**70**

---

S. Hazard Gillespie, Jr., U. S. Atty., for Southern Dist. of New York, New York City, for the United States. Silvio J. Mollo, Robert B. Fiske, Jr., John A. Guzzetta, New York City, of counsel.

William W. Kleinman, Brooklyn, N. Y., for defendant Melekh.

David M. Freedman, New York City, for defendant Hirsch.

HERLANDS, District Judge.

*Nature of the Proceedings*

These proceedings seek the removal of the defendants Igor Y. Melekh and Willie Hirsch to the United States District Court for the Northern District of Illinois, Eastern Division, there to answer a three-count indictment (No. 60 Cr. 529) filed against them on October 27, 1960.

*The Indictment Against the Defendants*

The first count of the indictment, hereinafter referred to as "the Illinois indictment," charges a conspiracy to violate Title 18 U.S.C.A. § 793. Part of the alleged conspiracy was to obtain information respecting the national defense of the United States of America by receiving and obtaining documents, sketches, photographs, maps and information concerning various places and military installations connected with the national defense, for delivery to the Union of Soviet Socialist Republics, with the knowledge and intent that those materials would be used to the advantage of that foreign nation.

It was a further part of the alleged conspiracy, according to the indictment, that the defendants would induce a United States citizen to obtain information relating to the national defense of this country, with the intent and reason to believe that the information would be used to the advantage of the Union of Soviet Socialist Republics; that the defendant Melekh would employ, supervise, and pay individuals for the purpose of so obtaining, delivering and transmitting such information; and that the defendant Melekh would devise a clandestine method of arranging meetings with individuals to whom he had given assignments to collect information relating to the national defense of this country. Thirteen overt acts in furtherance of the charged conspiracy are then alleged. Included in the alleged overt acts are cash money payments by the defendant Melekh to an individual on three occasions and also the acceptance by Melekh of a map and photographs.

The second count of the indictment charges a conspiracy to violate Title 18 U.S.C.A. § 951. Part of this alleged conspiracy was to induce and procure a United States citizen to act within the United States as an agent of the Government of the Union of Soviet Socialist Republics without prior notification to the Secretary of State and without the said United States citizen being a diplomatic or consular official or attache. It was a further part of the conspiracy, as pleaded, that said United States citizen would be paid for so acting as an agent of the Union of Soviet Socialist Republics for the purpose of obtaining and transmitting information and material for the use of that foreign nation. The overt acts in furtherance of this alleged conspiracy are the same as those set forth under the first count.

The third count charges a substantive violation of section 951, Title 18 U.S. C.A., by the defendant Hirsch, aided and abetted by Melekh.

*Proceedings Before the Commissioner*

After the indictment was filed on October 27, 1960, and on the same day, the defendants were duly arrested in the Southern District of New York.

On November 3, 1960, Hon. Earle N. Bishopp, United States Commissioner for the Southern District of New York, held a hearing, at which the defendants were represented by counsel of their own choice. Upon the testimony and exhibits presented before him, the Commissioner found that proof of identity had been

established and that the defendants Melekh and Hirsch are the persons named in the Illinois indictment.

The evidence before the Commissioner consisted of a certified copy of the Illinois indictment; the testimony of Richard H. Nachtsheim, a special F.B.I. agent; and photographs of the defendants (which photographs had previously been marked as grand jury exhibits before the grand jury that returned the indictment).

On November 3, 1960, the Commissioner recommended "the issuance of a warrant of removal to the Northern District of Illinois, Eastern Division for each defendant."

The certified copy of the indictment, the said two photographs, a transcript of the Commissioner's findings, and the Commissioner's final commitment and recommendation have been submitted to this Court.

Bail, duly fixed in the amount of $50,-000 for each defendant, was furnished by the defendant Melekh as to himself on November 4, 1960. Hirsch has been committed, in default of bail.

### I.

The defendants do not dispute the fact, independently established by the evidence, that they are the persons named as defendants in the Illinois indictment.

However, the defendant Melekh, interposing the claim of diplomatic immunity, resists the removal proceedings. According to the defense, this claim of diplomatic immunity has a double thrust: first, that Melekh's immunity renders the Illinois indictment void; second, that Melekh's immunity deprives this Court of jurisdiction, in the sense of power, to order his removal.

The Government's position is that, regardless of the question of the merits of Melekh's immunity claim, this Court must order the removal to the Northern District of Illinois because Rule 40 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., mandates a removal once it is established—as it has been established

in the case at bar—that an indictment has been returned against the defendants, and that they have been identified as the indicted defendants. The Government relies on the proposition that Rule 40 (effective March 21, 1946) was promulgated in order to effect "drastic and distinct innovations" designed to expedite and simplify removal proceedings; and that this Court, in the case at bar, has no alternative but to order the removal. See Holtzoff, Reform of Federal Criminal Procedure, 1944, 3 F.R.D. 445, 451; Holtzoff, Removal of Defendants in Federal Criminal Procedure, 1945, 4 F.R. D. 455, 468; Singleton v. Botkin, D.C. D.C.1946, 5 F.R.D. 173; Hemans v. Matthews, D.C.D.C.1946, 6 F.R.D. 3; United States v. Bessie, D.C.D.Cal.1947, 75 F.Supp. 95, 96–97; United States v. Binion, D.C.D.Nev.1952, 13 F.R.D. 238, 240, appeal dismissed 9 Cir., 1953, 201 F.2d 498, certiorari denied 1953, 345 U.S. 935, 73 S.Ct. 796, 97 L.Ed. 1363; United States v. Provoo, D.C.S.D.N.Y. 1954, 16 F.R.D. 341.

The Advisory Committee Notes To The Federal Rules Of Criminal Procedure For The United States District Courts (for text, see 4 Barron, Federal Practice and Procedure [Rules ed. 1951] 843, 868) state, in part, with reference to Rule 40:

"1. This rule modifies and revamps existing procedure. * * *

"The scope of a removal hearing, the issues to be considered, and other similar matters are governed by judicial decisions [collecting cases].

"2. The purpose of removal proceedings is to accord safeguards to a defendant against an improvident removal to a distant point for trial. On the other hand, experience has shown that removal proceedings have at times been used by defendants for dilatory purposes and in attempting to frustrate prosecution by preventing or postponing transportation even as between places a few miles apart. The object of the rule is adequately to meet each of these two situations."

Hon. Alexander Holtzoff [now United States District Judge for the District of Columbia], who served as secretary to the Advisory Committee (see F.R.C.P., 18 U.S.C.A. p. xv), makes the following comment (4 Barron, Federal Practice and Procedure [Rules ed. 1951], preface, p. xi):

"Proceedings for the removal of a defendant from one district to another for trial had long been a weak spot in Federal criminal procedure. The technicalities with which they had become encrusted through the years, at times enabled astute and resourceful counsel to resist their clients' removal across district lines for several years. This is no longer possible."

Rule 40, entitled "Commitment to Another District; Removal," pertinently provides:

"(3) Hearing; Warrant of Removal or Discharge. The defendant shall not be called upon to plead. If the defendant waives hearing, the judge shall issue a warrant of removal to the district where the prosecution is pending. If the defendant does not waive hearing, the commissioner or judge shall hear the evidence. If the commissioner hears the evidence he shall report his findings and recommendations to the judge. At the hearing the defendant may cross-examine witnesses against him and may introduce evidence in his own behalf. If it appears from the commissioner's report or from the evidence adduced before the judge that sufficient ground has been shown for ordering the removal of the defendant, the judge shall issue a warrant of removal to the district where the prosecution is pending. Otherwise he shall discharge the defendant. If the prosecution is by indictment, a warrant of removal shall issue upon production of a certified copy of the indictment and upon proof that the defendant is the person named in the indictment.

* * * If a warrant of removal is issued, the defendant shall be admitted to bail for appearance in the district in which the prosecution is pending in accordance with Rule 46. After a defendant is held for removal or is discharged, the papers in the proceeding and any bail taken shall be transmitted to the clerk of the district court in which the prosecution is pending."

Rule 40(3) of the Federal Rules of Criminal Procedure thus is explicit in delineating sharply the limited issues which may properly be considered in a removal proceeding, where the prosecution is by indictment. Read literally, the Rule requires the Court to issue the warrant of removal "upon production of a certified copy of the indictment and upon proof that the defendant is the person named in the indictment."

In only two reported instances have the courts deviated from the literal provisions of Rule 40(3). United States v. Wright, D.C.D.Hawaii 1954, 15 F.R.D. 184; United States v. Parker, D.C.D.C. 1953, 14 F.R.D. 146. Cf. United States v. Chiarito, D.C.D.Or.1946, 69 F.Supp. 317.

In United States v. Wright, supra, District Judge Wiig declined to issue a warrant of removal to the Territory of Alaska because the indictment charged a crime which, as a matter of law, could not be a violation of any law of the United States but only of the local laws of the then Territory of Alaska.

In United States v. Parker, supra, Chief Judge Laws declined to issue a warrant of removal where the factual pattern involved the following elements: (1) the indictment was more than four years old; (2) the defendant was over seventy-five years of age; (3) the defendant had appeared for trial in the Northern District of Illinois, where the indictment was filed, on eleven separate previous occasions but on each of his eleven appearances the case was adjourned by the prosecution; (4) the purpose of the removal warrant was not to proceed to trial but to determine the

defendant's mental ability to stand trial; and (5) no trial date was contemplated. Under the enumerated circumstances, the Court determined (14 F.R.D. at page 148) that the defendant would be "unduly harassed" by the issuance of a warrant of removal.

The rationale of the Wright and Parker decisions is inapplicable because the Illinois indictment herein as a pleading is predicated on alleged violations of clearly applicable Federal law, and there is no suggestion of harassment through abuse of the prosecutor's powers.

If the defendant Melekh's attack were confined to the Illinois indictment, this Court would be required to order removal without considering the merits of the defense claim of immunity.

However, the decisive feature of this aspect of the case is that the attack is not only on the validity of the Illinois indictment but also on the legal propriety of this Court's entertaining the removal proceedings at all. The challenge to this Court's own jurisdiction, that is, its power to conduct the removal proceedings, is fundamental and primary. It is a question that must be answered *in limine*. It cannot be deferred or reserved for the District Court for the District of Illinois. The present case is, therefore, unlike any of the cases cited by either counsel with respect to the interpretation of Rule 40.

We turn, as we must, to a consideration of the merits of defendant Melekh's claim of diplomatic immunity.

## II.

A statement of the material facts will sharpen the focus on the controlling issues of law.

For present purposes, the sources of fact herein may be considered to be the certificate (dated November 4, 1960) of the United States Department of State (Exh. 1, hereinafter referred to as "the State Department certificate"); the letter (dated November 8, 1960) of His Excellency, the Ambassador Extraordinary and Plenipotentiary of the U. S. S. R. to the United States of America, Mikhail A. Menshikov (Exh. A. for id., hereinafter referred to as "the Soviet Ambassador's letter"); the defendant Melekh's passport (No. 06211) and the American visas therein (Exh. B. for id.); and the factual statements made by Melekh's attorney in his oral argument and in his main and reply briefs submitted to this Court.

*The Soviet Ambassador's Letter*

The following is the complete text of the Soviet Ambassador's letter:

"Embassy Of The
Union Of Soviet Socialist Republics
"Washington 6, D. C.
"November 8, 1960

"The Honorable
District Judges of the U. S.
District Court for the
Southern District of New York

"Honorable Sirs:

"I hereby have the honor to draw your attention to the fact that the Soviet citizen, Igor Y. Melekh, has a diplomatic rank of the Second Secretary of the Ministry of Foreign Affairs of the USSR conferred on him in accordance with the provisions based on the Decree of the Presidium of the USSR Supreme Soviet of May 28, 1943.

"The Secretary General of the United Nations requested the Government of the USSR to make available the services of Mr. Melekh for the post of the Chief of the Russian language section in the office of Conference Services of the Secretariat of the UN and Mr. Melekh accepted this post with the knowledge and consent of the Government of the USSR.

"Mr. Melekh arrived in the United States on June 10, 1955, having the Soviet Diplomatic passport N 06211 and since that time has been attached to the Secretariat of the United Nations.

"The Secretariat of the United Nations and the Department of State of the United States at all these times had knowledge of and ac-

cepted the fact that Mr. Melekh retained and retains at the present time his diplomatic rank of the Second Secretary of the Ministry of Foreign Affairs of the USSR.

> "(Signed) M. Menshikov
> "Mikhail A. Menshikov
> "Ambassador Extraordinary and Plenipotentiary of the USSR to the
> "[Seal] USA"

Significantly, the Soviet Ambassador's letter does not state that Melekh was or is duly designated by the U. S. S. R. to serve as one of its representatives to the United Nations or that Melekh was or is on the staff of the U.S.S.R. delegation to the United Nations or that Melekh ever performed or was ever assigned to perform any diplomatic duties in behalf of the U.S.S.R. vis-a-vis the Government of the United States or any other government while he was here.

On the contrary, the letter makes it unmistakably plain that, ever since his arrival in the United States on June 10, 1955, Melekh "has been attached to the Secretariat of the United Nations" in the capacity of "Chief of the Russian language section in the office of Conference Services of the Secretariat of the UN."

*Melekh's Passport and the American Visas Therein*

Melekh's non-representative status with respect to the U.S.S.R. in relation to the United Nations and his non-diplomatic status with respect to the U.S.S.R. in relation to the United States are also evidenced by the terms of the American visas in his passport. The first two pages of the passport are in Russian; the third and fourth pages thereof are an official, printed French translation of the Russian. The translation recites, in relevant part, that it is "Passeport Diplomatique."

There are six separate American visas in the passport, bearing the following issuance dates: May 13, 1955 (p. 10 of the passport); May 25, 1957 (p. 20 of the passport); September 14, 1958 (p. 17 of the passport); May 25, 1959 (p. 27 of the passport); August 21, 1959 (p. 30 of the passport); and March 7, 1960 (p. 32 of the passport).

1. The first American visa (May 13, 1955) reads as follows:

> "Official Visa
> American Embassy
> Moscow; U. S. S. R.
> *Nonimmigrant Visa*
> Nonimmigrant classification G–4 pursuant 22 CFR 41.5; Imm. and Natlty. Act; Application No. V–105 2955
>
> Issued on 14 May 1955
> Valid through 13 August 1955 for single application for admission at United States ports of entry.
> New York only.
>
> Warren Kelsey
> American Vice Consul
> Employee of U. N. Secretariat."

2. The second American visa (May 25, 1957) reads exactly the same as the first one, except that a different application number is set forth. The date of issuance is May 27, 1957 and the expiration date is August 25, 1957. It was issued by William N. Turpin, American Consul. Like the first visa, it classifies the visa as "G–4" and notes "Employee of the U. N. Secretariat."

3. The third American visa (September 14, 1958) was issued by John A. Bywater at the American Resident Delegation and Consulate General, Geneva, Switzerland. It recites that it is "Nonimmigrant Visa (G–4)."

4. The fourth American visa (May 25, 1959) was issued by the Foreign Affairs Officer, Visa Office, Department of State, Washington, D. C. It is designated as "Nonimmigrant Visa G–4."

5. The fifth American visa (August 21, 1959) was issued by John A. McVickar, American Consul, at the American Embassy, Moscow. It is designated as "Nonimmigrant Visa G–4" and carries the notation: "Empl. of U. N. Secretariat."

6. The sixth American visa (March 7, 1960) was issued by the Foreign Affairs

Officer, Visa Office, Department of State, Washington, D. C. It is designated as "Nonimmigrant Visa G–4."

To recapitulate each of the six American visas were, on their face, designated as "Nonimmigrant Visa G–4," pursuant to 22 C.F.R. 41.5; and three of said visas carried the notation that Melekh was an "employee of the U. N. Secretariat."

22 C.F.R. (Code of Federal Regulations) section 41.5 sets forth the "classification symbols" and the "classification of nonimmigrants for purposes of documentation." Symbol "G–4" (listed under the columnar heading "Symbol to be inserted in visa") is used "to show the classification of the alien as a nonimmigrant"

[under the provisions of the Immigration and Nationality Act of 1952, section 101 (a)(15); 8 U.S.C.A. ch. 12, section 1101 (a)(15), popularly known as the McCarran-Walters Act], where he is in the class designated as "International organization officer or employee, and members of immediate family." Class "G–4" is likewise defined statutorily in the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101(a)(15)(G)(iv).

Both the Immigration and Nationality Act of 1952 and the cognate provisions in the Code of Federal Regulations sharply differentiate between "International organization officer or employee" and (for example) the following classes of nonimmigrant aliens:

| Class | Symbol to be inserted in visa | Citation |
|---|---|---|
| "Ambassador, public minister, career diplomatic or consular officer, and members of immediate family" | A-1 | 8 U.S.C.A. § 1101(a) (15) (A) (i); 22 C.F.R. § 41.5 |
| "Other foreign-government official or employee, and members of immediate family" | A-2 | 8 U.S.C.A. § 1101(a) (15) (A) (ii); 22 C.F.R. § 41.5 |
| "Principal resident representative of recognized foreign member government to international organization, his staff, and members of immediate family" | G-1 | 8 U.S.C.A. § 1101(a) (15) (G) (i); 22 C.F.R. § 41.5 |
| "Other representative of recognized foreign member government to international organization, and members of immediate family" | G-2 | 8 U.S.C.A. § 1101(a) (15) (G) (ii); 22 C.F.R. § 41.5 |
| "Representative of nonrecognized or nonmember foreign government to international organization, and members of immediate family" | G-3 | 8 U.S.C.A. § 1101(a) (15) (G) (iii); 22 C.F.R. § 41.5 |

———◆———

The "international organization" above referred to is [according to the Immigration and Nationality Act of 1952, title 8 U.S.C.A. section 1101(a)(15)(G)(i)] one "entitled to enjoy privileges, exemptions, and immunities as an international or-

ganization under the International Organizations Immunities Act (59 Stat. 669)."

The International Organizations Immunities Act, enacted in 1945 (title 22 U.S.C.A. §§ 288–288f; Public Law 291, chapter 652, 79th Cong., 1st Session 1945) contains provisions of controlling importance, discussed below in the course of this opinion.

The above-noted distinction (made in the Immigration and Nationality Act of 1952 and the implementing regulations) between "International organization officer or employee" and, on the other hand, "principal resident representative of recognized foreign member government to international organization" and "other representative of recognized foreign member government to international organization" is one that had been formulated previously in substantially the same language in the Headquarters Agreement of 1947 between the United States and the United Nations. Joint Resolution of August 4, 1947, c. 482, 61 Stat. 756, Public Law No. 357, 80th Congress, First Session; Full Text in Title 22 U.S.C.A. § 287, note at pp. 132–140.

It is the interplay between the International Organizations Immunities Act of 1945 and the Headquarters Agreement of 1947 that furnishes the key to the problem at bar, as will be shown in the ensuing discussion.

We return to a consideration of the evidence concerning the defendant's visas.

The Immigration and Nationality Act of 1952, section 101(a)(11), 8 U.S.C.A. section 1101(a)(11) defines the term "diplomatic visa" as "a nonimmigrant visa *bearing that title* and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may prescribe." (Emphasis supplied.) The regulations referred to are contained in 22 C.F.R. Parts 40 and 41.

The "types and validity of diplomatic visas," both "regular" and "limited" are governed by the provisions of 22 C.F.R. section 40.3(a) and (b). The "classes of aliens eligible to apply for diplomatic visas" of the "regular" type are defined and enumerated in 22 C.F.R. section 40.4 (a), while those who are eligible to apply for "limited diplomatic visas" are defined and enumerated in 22 C.F.R. section 40.4 (b).

The latter provision expressly *excludes* from its coverage "subordinate members, including employees" of any "international organizations so designated by Executive order." 22 C.F.R. section 40.4 (b) (1). The United Nations Organization has been so designated by Executive Order No. 9698 (Feb. 19, 1946, 11 F.R. 1809, as amended by Executive Order No. 10083, October 11, 1949). Title 22 U.S. C.A. § 288, note at p. 157.

Moreover, the regulations prescribe in detail the procedure governing the application for and issuance of diplomatic visas, including the explicit requirement that a diplomatic visa must bear the title "Diplomatic Visa" or the word "Diplomatic" must "be stamped diagonally across the lower left hand margin of the visa stamp, in such manner as to be partially covered by the impression seal of the office." 22 C.F.R. sections 40.7, 40.8, 40.9, 40.10.

It is crystal clear that, at all material times, Melekh was an employee of the United Nations; that he was not eligible to receive an American diplomatic visa; that he did not receive an American diplomatic visa; and that on each of the six occasions on which he did receive an American visa, each of the said visas was a *nondiplomatic* visa.

Even if Melekh had received a diplomatic visa, that circumstance per se would not be of decisive importance, as is shown by the decisions in United States v. Coplon, D.C.S.D.N.Y.1949, 84 F.Supp. 472, 475 and United States v. Coplon, D.C. S.D.N.Y.1950, 88 F.Supp. 915, 917–918. The present situation—where Melekh did not have a diplomatic visa—therefore presents an *a fortiori* case.

*Melekh's Exclusive Employment with the United Nations*

The U. S. S. R. has, of course, the unrestricted sovereign right, for its own

internal purposes, to confer any diplomatic rank on Melekh or to give him a diplomatic passport. But, in the context of the pending proceedings, there is no legal significance to the purely incidental circumstance that Melekh was a Second Secretary of the Ministry of Foreign Affairs of the U. S. S. R. or that he arrived in the United States with a Soviet Diplomatic passport.

The salient and uncontradicted facts are that, at all material times, Melekh came here in a nondiplomatic capacity and worked exclusively in a nondiplomatic capacity; that his official activities here were exclusively as a United Nations employee; that he is not a public minister of a foreign state, authorized and received as such by the President, nor a domestic or domestic servant of one (cf. 22 U.S.C.A. §§ 252, 254); that he did not enter the United States as an emissary from the U. S. S. R. to the United States and he was never received as such; that he was never notified to the United States as attached to the Soviet Embassy; that he was never accredited as a foreign diplomatic officer to any other government or to any international conference; and that he was never a member of the Soviet Delegation to the United Nations.

The contours of the defendant's argument are somewhat vague. However, an analysis of the respects in which the defendant Melekh explicitly states that he does not invoke the specific immunities statutes spotlights the defense rationale.

*Melekh Is not Entitled to Diplomatic Immunity Pursuant to Title 22 U.S.C.A. Sections 252–254*

█ The general diplomatic immunity statute, Title 22 U.S.C.A. § 252, reads in pertinent part as follows:

"Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, * * * whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, * * * is arrested or imprisoned, * * * such writ or process shall be deemed void."

The word "minister," as used in the above provision, is given a functional definition by Title 22 U.S.C.A. § 178, which expressly declares:

"The word 'minister', when used in sections * * * 251–258, * * * of this title, * * * shall be understood to mean the person invested with, and exercising, the principal diplomatic functions. * * *".

The State Department's duly authenticated certificate (Exh. 1) reads as follows:

"This is to certify that I, H. Charles Spruks, Acting Chief of Protocol, Department of State, am responsible for registering and maintaining, and have custody of, the records of the Department of State pertaining to the official status of all officers and employees of foreign governments in the United States who are entitled to diplomatic immunity pursuant to Sections 252–254 of Title 22 of the United States Code.

"I further certify that such records are kept in the District of Columbia.

"I have caused diligent search to be made of such records and have found no record to exist that Mr. Igor Y. Melekh, a Soviet national employed by the United Nations Secretariat, is, or ever has been, notified to and recognized by the Department of State in any capacity which would entitle him to diplomatic immunity pursuant to the above-mentioned Sections 252–254.

"I further certify that the only records ever received in the Office of Protocol regarding the said Mr. Melekh showed him to be an employee of the United Nations Secretariat, in which capacity he was entitled to immunity from suit and legal process only with respect to acts performed by him in his official capacity falling within his func-

tions as an employee of the United Nations, as provided in Section 288d (b) of Title 22 of the United States Code.

"Signed this fourth day of November, 1960, at Washington, D.C.
"(Signed) H. Charles Spruks

"H. Charles Spruks
"Acting Chief of Protocol"

Melekh's attorney expressly disavows any claim of immunity under Title 22 U.S.C.A. §§ 252–254. In his reply memorandum (pp. 2, 10) he states:

"The defendant does not claim that he is entitled to diplomatic immunity under this Statute. Nor is it necessary that he should do so. He is entitled to diplomatic immunity by virtue of the Law of Nations (International Law) which is also the Law of the United States. * *

"Furthermore, as we have argued above, the assertion of immunity by the defendant is not based upon Sections 252 and 254 of Title 22 of the U.S. Code."

This disclaimer of possible immunity under Title 22 U.S.C.A. § 252 is defendant's unavoidable concession to the manifest fact that he was not a Soviet diplomat accredited to and received by the Government of the United States. If he were, he would have received complete immunity.

*Melekh Is not Entitled to Immunity Pursuant to the International Organizations Immunities Act of 1945*

In 1945, Congress enacted the International Organizations Immunities Act (Title 22 U.S.C.A. §§ 288–288f, Public Law 291, chapter 652, 79th Cong., 1st Session 1945). See U.S.Code Congressional Service, 79th Cong. 1st Session 1945, pp. 646–650 and pp. 946–952 (H.R. No. 1203), Nov. 12, 1945, to accompany H.R. No. 4489). The report of the House Committee on Ways and Means (p. 950) pointed out:

"It should be noted that under this provision and section 8(c) there would not be extended full diplomatic immunity from judicial proc-ess as in the case of diplomatic officers."

The House Report (p. 951) concluded with the following statement:

"The committee is satisfied that this legislation has been prepared with great care, that it will safeguard the interests of the United States while enabling this country to fulfill its commitments in connection with its membership in international organizations, and that it should therefore pass."

The pertinent provisions of the statute (Title 22 U.S.C.A. § 288 et seq.) are as follows:

"§ 288. Definition of 'international organization'; authority of President

"For the purposes of sections 288–288f of this title, * * *, the term 'international organization' means a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation, and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in said sections. * * *"

"§ 288d. Privileges, exemptions, and immunities of officers, employees, and their families; waiver

"(a) Persons designated by foreign governments to serve as their representatives in or to international organizations and the officers and employees of such organizations, and members of the immediate families of such representatives, officers, and employees residing with them, other than nationals of the United States, shall, insofar as concerns laws regulating entry into and departure from the United States, alien registration and fingerprinting, and the registration of foreign agents, be enti-

tled to the same privileges, exemptions, and immunities as are accorded under similar circumstances to officers and employees, respectively, of foreign governments, and members of their families.

"(b) Representatives of foreign governments in or to international organizations and officers and employees of such organizations shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees except insofar as such immunity may be waived by the foreign government or international organization concerned."

"§ 288e. Notification to and acceptance by Secretary of State of personnel; deportation of undesirables; extent of diplomatic status

"(a) No person shall be entitled to the benefits of sections 288–288f of this title, * * *, unless he (1) shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee; or (2) shall have been designated by the Secretary of State, prior to formal notification and acceptance, as a prospective representative, officer, or employee; or (3) is a member of the family or suite, or servant, of one of the foregoing accepted or designated representatives, officers, or employees.

\* \* \* \* \* \*

"(c) No person shall, by reason of the provisions of said sections, be considered as receiving diplomatic status or as receiving any of the privileges incident thereto other than such as are specifically set forth herein."

Title 22 U.S.C.A. § 288 et seq. was applied to the United Nations by Executive Order No. 9698 (February 19, 1946), 11 F.R. 1809, as amended by Executive Order No. 10083 (1949); 22 U.S.C.A. 288 note at page 157.

Section 288d(a), relating to laws regulating entry and departure from the United States, alien registration, and fingerprinting, provides that employees, officers, and representatives in international organizations are entitled to the same immunities as officers and employees of foreign governments.

However, section 288d(b), relating to immunity from suit and legal process, provides that representatives, employees, and officers of international organizations have immunity only with respect to "acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees." This provision does not confer general diplomatic status or immunity. United States v. Coplon, 1949, 84 F.Supp. 472.

The foregoing provision adopted a functional criterion for determining the scope of immunity; and, in so doing, it did not differentiate between representatives of the Member States of the United Nations and, on the other hand, officials and employees of the Organization.

Defendant's attorney does not assert immunity under the International Organizations Immunities Act of 1945, which has been rendered applicable to United Nations officers and employees. In his reply brief (p. 10), referring to that statute, defendant's attorney states: " * * * we respectfully submit [1] That the defendant has not made an assertion of immunity on the ground of this Statute; * * *."

This disclaimer of possible immunity under the International Organizations Immunities Act can mean only that the defendant does not argue that the alleged criminal acts, as charged in the indictment, grew out of or were incidental to his official activities as a United Nations officer or employee. If the charged acts had been ancillary to his United Nations functions, the defendant would have received complete

immunity under the International Organizations Immunities Act.

*Melekh Is not Entitled to Immunity Pursuant to the Headquarters Agreement of 1947*

On June 26, 1947, the United States and the United Nations entered into an agreement commonly called "the Headquarters Agreement." This agreement, signed on June 26, 1947 and covered by a joint resolution of August 4, 1947, authorized the President to effectuate the agreement. The agreement was approved on August 4, 1947. Title 22 U.S.C.A. § 287 note at page 132; 61 Stat. 756, Chap. 482, 80th Cong. 1st Sess. 1947. The agreement became operative on November 21, 1947 by an exchange of notes between the United States representative to the United Nations and the Secretary-General of the United Nations.

Article V of the Headquarters Agreement, entitled "Resident Representatives to the United Nations," consists of Section 15, reading as follows:

"Section 15

"(1) Every person designated by a Member as the principal resident representative to the United Nations of such Member or as a resident representative with the rank of ambassador or minister plenipotentiary,

"(2) such resident members of their staffs as may be agreed upon between the Secretary-General, the Government of the United States and the Government of the Member concerned,

"(3) every person designated by a Member of a specialized agency, as defined in Article 57, paragraph 2, of the Charter, as its principal resident representative, with the rank of ambassador or minister plenipotentiary, at the headquarters of such agency in the United States, and

"(4) such other principal resident representatives of members to a specialized agency and such resident members of the staffs of representatives to a specialized agency as may be agreed upon between the principal executive officer of the specialized agency, the Government of the United States and the Government of the Member concerned,

shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it. In the case of Members whose governments are not recognized by the United States, such privileges and immunities need be extended to such representatives, or persons on the staffs of such representatives, only within the headquarters district, at their residences and offices outside the district, in transit between the district and such residences and offices, and in transit on official business to or from foreign countries."

Under the above provisions of the Headquarters Agreement, diplomatic immunity is granted to four categories of representatives of member nations of the United Nations. However, the defendant cannot avail himself of the Headquarters Agreement. He is not the principal resident representative of a member; nor is he a resident representative with the rank of ambassador or minister plenipotentiary; nor is he a resident member of the staff of one of the aforementioned emissaries; nor does defendant come within any of the other categories of individuals granted immunity under the Headquarters Agreement.

The defendant's non-reliance on the Headquarters Agreement of 1947 silhouettes the fact that he does not construe his position—either as the Second Secretary of the Soviet Foreign Ministry or as a United Nations employee—to be equivalent to or inclusive of the position of representative of the U.S.S.R. to the United States. If he had been a member of any of the four categories of repre-

sentatives specified in the Headquarters Agreement, he would have received diplomatic immunity for his alleged acts.

The Headquarters Agreement did not confer the immunities of accredited diplomatic envoys upon officers and employees of the United Nations, as they are not mentioned in the Headquarters Agreement. Consequently, the immunity enjoyed by officers and employees of the United Nations—as distinguished from the four categories of resident representatives to the United Nations—are those that are defined in the International Organizations Immunities Act. And, as noted, the immunity provisions of the International Organizations Immunities Act sets up a functional test of immunity.

The United Nations is a legal entity, separate and distinct from the member nations. While it is not a State nor a super-State, it is an international person, clothed by its members with the competence necessary to discharge its functions. Advisory Opinion, Reparation for Injuries Suffered in the Service of the United Nations, I.C.J.Reports 1949, 174; 43 American Journal of International Law 589 (1949). See Balfour, Guthrie & Co. v. United States, D.C. D.Cal.1950, 90 F.Supp. 831, 832.

An employee of the United Nations, as such, is separate and distinct from persons designated by foreign governments to serve as their governmental representatives in or to the United Nations. The distinction between governmental representatives and United Nations officers appears in the United Nations Charter, Article 105, and in the International Organizations Immunities Act of 1945, 22 U.S.C.A. §§ 288b and 288d.

This distinction is of decisive importance in the present case because the Headquarters Agreement of 1947 carved out of the International Organizations Immunities Act of 1945 four categories of governmental representatives and conferred diplomatic immunity on them—leaving, however, United Na-

tions officials and employees within the narrower ambit of limited immunity as granted by the International Organizations Immunities Act of 1945. The defendant neither qualifies for nor claims such immunity.

The foregoing analysis reveals that the defendant's position embraces these negative features: (1) the defendant does not claim that he was or is a diplomatic officer accredited to the United States or to any other government; (2) the defendant does not claim that the acts charged against him in the indictment were, directly or remotely, related to the functions of his United Nations employment; and (3) the defendant does not claim that he was a representative of the U. S. S. R. to the United Nations or a member of the staff of a U. S. S. R. representative to the United Nations. What, then, does the defendant affirmatively offer as the sources of his claimed diplomatic immunity?

The two bases offered are: Article 105 of the United Nations Charter and the uncodified, general principles of international law.

*Melekh Is Not Entitled to Diplomatic Immunity Pursuant to Article 105 of the United Nations Charter*

Article 105 of the Charter of the United Nations (59 Stat. [79th Cong. 1st Sess. 1945] 1033, 1053), provides:

#### *"Article 105*

"1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.

"2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.

"3. The General Assembly may make recommendations with a view to determining the details of the application of paragraphs 1 and 2 of this Article or may propose conven-

tions to the Members of the United Nations for this purpose."

As a treaty signed and ratified by the United States, the Charter of the United Nations is part of "the supreme Law of the Land." U.S.Const. Art. VI, par. 2.

Under Article 105(2) of the United Nations Charter, the United States has an obligation to provide the representatives of member nations and the officials of the United Nations with such privileges and immunities as are "necessary" for the independent exercise of their "functions in connection with the [United Nations] Organization."

Measures implementing Article 105 of the United Nations Charter need only pass the constitutional test of being "necessary and proper" (U.S.Const., Art. I, section 8, clause 18), which in turn depends on "the functional standard set up in the Charter." Note, The United Nations Under American Municipal Law: A Preliminary Assessment, 55 Yale L.J. 778, 782 (1946); Comment, The Privileges and Immunities of United Nations Delegates and Officials—The International Organization Immunities Act, 46 Mich. L.Rev. 381 (1948).

The privileges and immunities to be enjoyed by representatives of the members of the United Nations and by officials of the United Nations itself are by the very terms of Article 105 qualified and conditioned. Their privileges and immunities are those that "are necessary for the independent exercise of their functions in connection with the Organization." As expressly formulated by the United Nations Charter, the immunity is limited and specifically functional in scope and character. It is not the unlimited and unqualified immunity traditionally given to diplomats.

The deliberateness with which the use of the term "diplomatic" was avoided in the drafting of Article 105 is brought into sharp focus by a number of salient factors. The precise intent of the United Nations in drafting Article 105 is demonstrated by events both prior to and after the adoption of the particular language in Article 105.

Article 105 as it presently reads (except for renumbering) was drafted by the Legal Problems Committee of the San Francisco United Nations Conference and adopted by the Conference itself. Hill, Immunities and Privileges of International Officials (Carnegie Endowment for International Peace, 1947) pp. 102, 103.

The Legal Problems Committee, commenting on the text of Article 105, stated:

"In order to determine the nature of the privileges and immunities, *the Committee has seen fit to avoid the term 'diplomatic' and has preferred to substitute a more appropriate standard,* based, for the purposes of the Organization, on the necessity of realizing its purposes and, in the case of the representatives of its members and officials of the Organization, on providing for the independent exercise of their functions. * * * (Emphasis supplied.)

"The draft article proposed by the Committee does not specify the privileges and immunities respect for which it imposes on the member states. This has been thought superfluous. The terms 'privileges' and 'immunities' indicate in a general way all that could be considered necessary to the realization of the purposes of the Organization, to the free functioning of its organs and to the independent exercise of the functions and duties of their officials: exemption from tax, immunity from jurisdiction, facilities for communication, inviolability of buildings, properties, and archives, etc. * * * But if there is one certain principle it is that no member state may hinder in any way the working of the Organization or take any measures the effect of which *might be to increase its* burdens, financial or other. (Report of the Rapporteur of Committee IV/2, as approved by the Committee, Document 933 IV/2/42(2), June 12, 1945, Documents of the United Nations Conference on International Organization, San Francisco, 1945,

Vol. XIII, Commission IV, Judicial Organization, pp. 703–705)." Quoted in Hill, op. cit. supra, 103–104

It would appear to be indisputable that the Legal Problems Committee rejected the term "diplomatic immunities" and, instead, adopted the narrower criterion geared to the functions of the United Nations. "The functional principle as the basis" for conferring immunities on the officials of international organizations "seems now almost universally recognized." Kunz, Privileges and Immunities of International Organizations, 41 A.J.I.L. 828, 842, 847, 854 (1947).

The contemporaneous preparation of a significantly different provision by another United Nations committee is illuminating, if additional light is needed. This other committee prepared the Statute of the International Court of Justice. The committee recommended (and the United Nations Conference adopted) Article 19 of the Statute of the International Court of Justice, which grants "diplomatic" privileges and immunities to members of that court. "A distinction was thus introduced between the prerogatives of the judges and those of international officials." Hill, op. cit. supra, 105.

The language of Article 105 of the United Nations Charter—"immunities as are necessary for the independent exercise of their functions in connection with the Organization"—is to be sharply contrasted with the cognate provision in the covenant of the League of Nations, Art. VII, par. 4, which provided:

"Representatives of the Members of the League and officials of the League, when engaged on business of the League, shall enjoy *diplomatic privileges and immunities.*" (Emphasis supplied.)

Even the League of Nations provision contained the qualifying proviso: "when engaged on business of the League." But that provision, nevertheless, did use the phrase "shall enjoy diplomatic privileges and immunities"—well-known language studiously avoided in the United Nations Charter, Article 105. "The legal status of United Nations delegates and officials is not tied [by Article 105] to the prerogatives of diplomatic agents by international law, as was done in the Covenant of the League of Nations." Comment, Privileges and Immunities of United Nations Delegates and Officials, 46 Michigan L.Rev. 381, 382 (1948); Kunz, Privileges and Immunities of International Organizations, 41 A.J.I.L. 828, 839, 844 (1947).

The Preparatory Commission of the United Nations submitted a study on privileges and immunities to the first session of the General Assembly. Report of the Preparatory Commission of the United Nations (Preparatory Commission of the United Nations, 1945), Chap. VII, pp. 61–71. (Quoted in Hill, op. cit. supra, 205–223.) In its study, the Preparatory Commission stated:

"In this report the expression 'diplomatic privileges and immunities' is used for convenience to describe the whole complex of privileges and immunities which are in fact accorded to diplomatic envoys. While it will clearly be necessary that all officials, whatever their rank, should be granted immunity from legal process in respect of acts done in the course of their official duties, whether in the country of which they are nationals or elsewhere, *it is by no means necessary that all officials should have diplomatic immunity.* On the contrary, there is every reason for confining full diplomatic immunity to the cases where *it is really justified.* Any excess or abuse of immunity and privilege is as detrimental to the interests of the international organization itself as it is to the countries who are asked to grant such immunities." (Emphasis supplied.) (Quoted in Hill, op. cit. supra, 207–208.)

Under paragraph 3 of Article 105 of the United Nations Charter, the General Assembly may make recommendations "with a view to determining the details of the application" of the first two immunities paragraphs. On February 13, 1946, the General Assembly approved the General

Convention on Privileges and Immunities of the United Nations. Hill, op. cit. supra, 224–231. Article V, section 18 of the General Convention applied to United Nations officials—as distinguished from the representatives of the United Nations members—and would render them immune from legal process "in respect of words spoken or written and all acts performed by them in their official capacity; * * *." The privileges and immunities accorded to diplomatic envoys in international law were proposed to be made applicable (by Article V, section 19) only to the Secretary-General and Assistant-Secretaries General and their families. Hill, op. cit. supra, 228.

Although the Convention proposed by the General Assembly has not been acceded to by the United States, the restrictive language of the Convention is further demonstration "that the United Nations itself does not conceive the charter phrase 'Such privileges and immunities as are necessary,' to encompass subordinate officials' freedom from arrest for crimes unconnected to the exercise of their United Nations functions." United States v. Coplon, 84 F.Supp. 472, 474, No. 3.

The language of Article 105 of the United Nations Charter, its legislative history and the intention of its draftsmen refute completely the defendant Melekh's contention that the immunity granted by Article 105 is "similar to the immunities granted to ambassadors and public ministers throughout the civilized world, including specifically immunity from jurisdiction." Defendant's reply memorandum, p. 11.

Assuming *arguendo* that Article 105 is a decretal provision, the Court is of the view that the defendant Melekh does not come even remotely within its protective reach. The alleged acts forming the subject of the indictment were patently not "necessary for the fulfillment of" the United Nation's "purposes," nor were they "necessary for the independent exercise" of the functions of Member States' representatives and United Nations officials "in connection with the

[United Nations] Organization." See United States v. Coplon, D.C.S.D.N.Y. 1951, 84 F.Supp. 472, 474.

The defendant has claimed diplomatic status and immunity because of his original appointment by the U. S. S. R.; and he explains his non-accreditation to the United States by the fact that he was sent to the United Nations, not to the Government of the United States. Diplomatic immunity of non-accredited persons is the result of functional necessity. The defendant has claimed neither diplomatic nor international functions which would warrant his being granted immunity, in the absence of applicable treaty provisions.

In essence, the defendant claims that his government can create diplomatic immunities in the United States simply by characterizing him a "diplomat" and sending him to work in the United Nations, regardless of his actual duties. Neither the United Nations nor the United States recognizes "such a broad and potentially dangerous power in member nations, all of whom agreed to the charter limitation to 'such privileges and immunities as are necessary for the independent exercise of their function.'" Comment, Jurisdictional Immunity of United Nations Employees, 49 Michigan L.Rev. 101, 104 (1950).

To discharge its obligation under the United Nations Charter, the United States has enacted the two statutes already considered: the International Organizations Immunities Act of 1945 and the Headquarters Agreement of 1947. These statutes do not limit the privileges and immunities referred to in Article 105 of the Charter. On the contrary, they implement this country's obligation to provide the necessary privileges and immunities for representatives to the United Nations and United Nations officials. Like Gubitchev's activities in the Coplon case, D.C.S.D.N.Y.1949, 84 F.Supp. 472; Comment, 49 Mich.L.Rev. 101 [1950]), the defendant Melekh's alleged criminal acts fall outside the limits of any immunity that he is entitled to claim.

*Defendant Is not Entitled to Diplomatic Immunity Under the Law of Nations*

Putting aside the federal statutes (i. e., the general diplomatic immunities statute, the International Organizations Immunities Act of 1945, and the Headquarters Agreement of 1947) and the United Nations Charter, Article 105—the defendant seeks to establish his right to immunity by virtue of the Law of Nations.

 There can be no dispute about the proposition that American courts are bound to recognize and apply the Law of Nations as part of the law of the land. See State of Kansas v. State of Colorado, 1907, 206 U.S. 46, 97, 27 S.Ct. 655, 51 L.Ed. 956.

 It is likewise indisputable that the diplomatic immunities statute (Title 22 U.S.C.A. § 252) is "generally declaratory of international law" and is "designed to give it a specific local application." Barnes, Diplomatic Immunity From Local Jurisdiction: Its Historical Development Under International Law and Application In United States Practice, The Department of State Bulletin, XLIII, No. 1101 (Aug. 1, 1960) 173, 176; 4 Hackworth, Digest of International Law (1942) 460, 461; Trost v. Tompkins, D.C.Mun.App.1945, 44 A.2d 226, 228; Bergman v. DeSieyes, D.C.S.D.N.Y. 1946, 71 F.Supp. 334; In re Baiz, 1890, 135 U.S. 403, 420, 10 S.Ct. 854, 34 L.Ed. 222.

The defendant Melekh argues that his diplomatic status "arises out of the relationship between his government and the United Nations." Defendant's reply memorandum of law, p. 10. This statement creates a spurious issue.

 The certificate of the Department of State (Exh. 1) states "that the only records ever received in the Office of Protocol regarding the said Mr. Melekh showed him to be an employee of the United Nations Secretariat." But aside from that certificate, all the other evidence in the record (including the Soviet Ambassador's letter, the American visas in the defendant's passport, and factual oral and written statements made in behalf of the defendant) shows that the relationship between the defendant himself and the United Nations was only that of employee and employer, not that of a Member State's representative to the United Nations and not that of a functioning diplomatic officer.

The defendant's main memorandum of law (p. 3) states:

"The passport *and visa* under which Mr. Melekh entered the United States reflected his claim and the claim of his government that he enjoys diplomatic status * * *." (Emphasis supplied.)

This statement is factually erroneous, as the visas themselves show.

It is neither the defendant's position with his own government, as such, nor the relationship of the defendant's government, as such, with the United Nations that is decisive. What counts is the actual position occupied by the defendant in the United Nations and his actual duties and functions in the United Nations. Regardless of the significance of the defendant's lack of accreditation to the United States or to any other nation, and judged by the criteria established by the Law of Nations, the defendant was not a diplomatic agent when he entered the United States.

The authorities relied on by the defendant indicate the fundamental fallacy of his legal position.' Most of these authorities deal with the inapposite situation of admittedly diplomatic officers who were *in transitu.* For example, the cited discussion in 4 Hackworth, Digest of International Law (1942), 460, 461, related to a Russian diplomatic agent in Mexico, who was en route to Mexico via the United States and who was exempt from a head tax applicable to persons entering this country.

Similarly, in Bergman v. DeSieyes, D.C.S.D.N.Y.1946, 71 F.Supp. 334, a French diplomatic officer, duly accredited to Bolivia, was traveling through the United States to his post in the other country. Likewise, in Holbrook v. Hen-

derson, 4 Sandf. 619 (Superior Ct. N.Y. C.1851), the defendant, the duly accredited ambassador of Texas, having been duly received by the governments of England and France, was traveling through New York City on his return to Texas.

The immunities of duly accredited diplomatic agents while en route to their post (see Harvard Research In International Law, Draft Convention on Diplomatic Privileges and Immunities, 26 A.J. I.L.Supp. 15, 85–89 [1932]) is a subject not involved in the case at bar.

The defendant admits (reply memorandum, p. 6) that he entered the United States "for the *sole* purpose of assuming his post as an official of the United Nations" (emphasis supplied) and that (p. 12) he had requested the United States for permission to travel to this country "for the purpose of assuming his post as an official of the United Nations." In line with the conceded fact that he was to be a United Nations employee, he was given a G–4 visa and not a diplomatic visa.

The defendant argues (main memorandum, pp. 9–10):

"There are many instances when member states have made available Ambassadors and other diplomatic officials for the accomplishment of particular tasks of the United Nations with the understanding on the part of these member states, as well as that of the Secretary General of the United Nations, that these diplomats would only be made available to serve as officials of the United Nations on condition that they should be able to retain their diplomatic status with all the privileges and immunities accompanying this status. If these privileges and immunities were denied, the member states would not make these diplomats available and the work of the United Nations would be seriously interfered with. The act of the U.S.S.R. in making available to the United Nations Mr. Melekh the Second Secretary of its Foreign Minis-

try to serve as Chief of the Russian Language Section in the Office of Conference Service of the Secretariat and the acceptance of Mr. Melekh in that capacity was an act. of the same essential nature."

The foregoing is simply an argumentative conclusion and characterization of the facts that do not support the defendant's claim.

In his oral argument, the defendant's attorney said he was making a tender of proof of the fact, *inter alia,* "that a request was made by the Secretariat, although I may have said the Secretary General and that may be the fact, your Honor—or somebody who speaks for the Secretariat of the United Nations, a request was made for someone to occupy the office that Mr. Melekh has been occupying in the United Nations since 1955; and that Mr. Melekh's government advised the Secretariat that they have a person available who is a diplomat, if they used that language, or the Second Secretary—I am not sure, your Honor, whether they specified him by his title or whether they specified him generally— and that he would be available to take that position, with the understanding that he was to retain the status" (s. m. pp. 39–40).

In contrast to the foregoing assertion, the Soviet Ambassador's letter (Defendant's Exh. A for identification, which, together with defendant's passport, has been treated as in evidence) does not characterize the defendant's status nor does it use the word "status." It simply states the fact that the defendant "has a diplomatic rank of the Second Secretary of the Ministry of Foreign Affairs" and that "[t]he Secretariat of the United Nations and the Department of State of the United States at all these times had knowledge of and accepted the fact that Mr. Melekh retained and retains at the present time his diplomatic rank of the Second Secretary of the Ministry of Foreign Affairs of the USSR."

The Soviet Ambassador's letter —although referring to the United Nations Secretary-General's request for the

defendant's services—does not allude to any alleged "understanding" that the defendant was to retain the "status" of a diplomat.[1] Giving the letter the broadest intendment, the Court is of the view that the letter refers to the knowledge on the part of the United Nations and the United States since 1955 that the defendant retained the USSR title of Second Secretary of the Ministry of Foreign Affairs while working for the United Nations.

The Soviet Ambassador's letter is conclusive of the internal relationship between the defendant and the USSR. See United States v. Pink, 1941, 315 U.S. 203, 220, 62 S.Ct. 552, 86 L.Ed. 796; Banco De Espana v. Federal Reserve Bank, 2 Cir., 1940, 114 F.2d 438, 443; Agency of the Canadian Car & Foundry Co. v. American Can Co., 2 Cir., 1919, 258 F. 363, 368, 6 A.L.R. 1182. However, that letter does not describe the actual functions or duties of the defendant since 1955 as other than the functions or duties as a United Nations employee. Nothing in the letter neutralizes the fact that the defendant's official activities while in the United States were those as a United Nations employee. His attorney, in oral argument, referred to his "certificate of employment with the United Nations" (s. m. p. 41).[2]

1. Defense counsel does not explicitly state that such an understanding was ever entered into on behalf of the United Nations nor does the Soviet Ambassador's letter indicate a bestowal of diplomatic immunity on the defendant by the United Nations Secretariat. Assuming *arguendo* that the Secretariat or the Secretary-General himself had agreed to grant diplomatic immunity to the defendant, an agreement of that nature would have no legal effect.

The United Nations cannot grant immunity so far as it itself is concerned because the United Nations is not a sovereign State.

The juridical nature of the United Nations as a legal entity was expounded by the International Court of Justice in an advisory opinion, dated April 11, 1949. Reparation For Injuries Suffered In The Service Of The United Nations. I.C.J. Reports, 1949, p. 174; also reported in full in 43 A.J.I.L. 589 (1949). The International Court of Justice pointed out:

"Accordingly, the Court has come to the conclusion that the Organization is an international person. That is not the same thing as saying that it is a State, which it certainly is not, or that its legal personality and rights and duties are the same as those of a State. (43 A.J.I.L. at 592-593) * * * Whereas a State possesses the totality of international rights and duties recognized by international law, the rights and duties of an entity such as the Organization must depend upon its purposes and functions as specified or implied in its constituent documents and developed in practice." 43 A.J.I.L. at 593.

See Balfour, Guthrie & Co. v. United States, D.C.N.D.Cal.1950, 90 F.Supp. 831, 832.

The United Nations does not possess the power to grant immunity against the operation of the laws of the sovereign government of the United States.

The subject of immunity is covered comprehensively in the multi-lateral treaty known as the United Nations Charter (Article 105) and in the Headquarters Agreement of 1947, entered into between the United Nations and the United States. The United Nations Charter and the Headquarters Agreement cannot be amended or suspended by any one individual official.

2. Any ambivalence of the defendant's official character is resolved by an inquiry into his actual activities and functions vis-a-vis the United Nations and the United States. The test is functional, not titular. The pertinent question is whether the defendant, while in the United States, possessed "functions" as an agent of his government "for the transaction of its diplomatic business abroad." See In re Baiz, 1890, 135 U.S. 403, 419, 10 S.Ct. 854, 858.

A foreign official may have "a double political capacity" (cf. In re Baiz, supra, 135 U.S. at page 424, 10 S.Ct. at page 860). If, however, he functions in fact only in a non-diplomatic character and is recognized only in that character, he does not possess diplomatic status and the immunities appertaining thereto.

Rank or title is only one evidentiary circumstance of diplomatic function. But rank or title does not ipso facto create diplomatic status. Even entry into this country on a diplomatic visa may not be conclusive. See United States v. Coplon, D.C.S.D.N.Y.1950, 88 F.Supp. 915, 920.

Inasmuch as the defendant came here for the sole purpose of working for the United Nations and he worked exclusive-

For the purposes of this case, the legal effect of the defendant's title of "Second Secretary of the Ministry of Foreign Affairs" is only that of a brevet super-added to his United Nations designation.

In his oral argument, the defendant's attorney stated:

"Now that is a diplomatic passport, your Honor, and they do not issue visas upon diplomatic passports without the acceptance of the diplomatic status of the applicant (s. m. p. 30). * * * The one who grants the visa recognizes the diplomatic status of the person who presents a diplomatic passport (s. m. p. 31)."

The foregoing assertion is, as shown already, without merit in point of fact and of law. Although the United States does issue diplomatic visas in appropriate situations, the defendant was not given a diplomatic visa. He was given a G-4 visa as a United Nations employee.

Inasmuch as the defendant did not enter the United States in 1955 or thereafter to date as a diplomatic officer and he has not been performing diplomatic functions or activities *de facto* or *de jure* in the United States, he is not entitled to diplomatic immunity under the general principles of international law—even if it be assumed *arguendo* that the specific and limited immunities provisions of Article 105 of the United Nations Charter and of the federal statutes are not dispositive of the defendant's claim.

Even under the most liberal draft-proposal—i. e., that formal or official acceptance or reception by the receiving state is not controlling and that the officer obtains immunity at the moment when he enters upon the territory of the receiving government—it is an essential pre-condition to immunity that the officer have in fact a diplomatic character when he enters and that he make known his position and status as such to the host government. See Harvard Research In International Law, Draft Convention on Diplomatic Privileges and Immunities, 26 A.J. I.L.Supp. 15, 90 (1932).

 There is not the slightest intimation that the defendant as a diplomat was "received as such" by the United Nations Organization. See Farnsworth v. Zerbst, 5 Cir., 1938, 98 F.2d 541, 544. "[I]t seems settled as principle that the consent or acquiescence of the 'receiving' state is a necessary condition precedent to immunity, * * *." 50 A.J.I.L. 115, Deener, Some Problems Of The Law Of Diplomatic Immunity, at 118 (1956). It is elementary "that no foreign diplomat may exercise his functions without the consent of the receiving state." Preuss, Capacity For Legation And The Theoretical Basis of Diplomatic Immunities, 10 N.Y.U. Law Quarterly Review (1932-1933) 170, 177.

 The defendant's "official position in his government is not decisive of his right to enjoy immunity from suit in our courts." See Trost v. Tompkins, D.C.Mun.App.1945, 44 A.2d 226, 230. The defendant does not even intimate that he had, in fact, exercised diplomatic functions and that any government consented to or acquiesced in receiving him in a diplomatic capacity.[3]

As an employee of the United Nations, the defendant was not the representative of any particular state. He performed his official "duties by authority of an international organization; [he was] * * * neither accredited to any particular government, nor [was he] * * * sent on a temporary mission on behalf of any sovereign independent state." Deak, Classification, Immunities and Privileges of Diplomatic Agents, 1 Southern California L.Rev. 209, 332, 333.

---

ly for the United Nations, his diplomatic title became an appendage without function while he was in the United States as a United Nations employee.

**3.** The normal requirement of accreditation and recognition as a preliminary to binding diplomatic status is not a punctilio excogitated by a stickler of etiquette. It is a centuries-old requirement dictated by the practical necessities of political intercourse.

Under the well-known Headquarters Agreement in force since 1947, there is a modus operandi readily available to a member state of the United Nations to secure diplomatic immunity for one of its diplomatic corps who is to be assigned to some particular United Nations mission or task. If the particular member of the diplomatic corps is duly placed in one of the four categories of representatives specified in the Headquarters Agreement, he will obtain full diplomatic immunity.

Any other course of procedure—such as the results attributed by the defendant Melekh to the retaining of his diplomatic rank while serving as a United Nations official and not as his country's representative—would fly in the face of specifically applicable statutes and would disrupt the established arrangement for diplomatic immunity to specified categories of governmental representatives and their staff, so meticulously worked out between the United Nations and the United States.

*Original Jurisdiction of the Supreme Court not Applicable*

The Supreme Court has original and exclusive jurisdiction in proceedings against ambassadors or other public ministers of foreign states. Constitution, Art. III, sec. 2, clause 2; 28 U.S.C.A. § 1251(a) (2).

As the defendant Melekh has no diplomatic status, he does not qualify as diplomatic agent or officer under any of the liberal definitions of "public minister." This is not a case within the original and exclusive jurisdiction of the Supreme Court.

## III.

*Summary and Conclusion*

The problem of the privileges and immunities of international organizations and of their officials and employees is one phase of the modern Law of Nations. The immunities of the personnel of international organizations have evolved out of a two-fold interacting process. That process has operated by analogy to the traditional concepts of diplomatic and parliamentary immunities and by recognition of the vital importance of the independent functioning of international organizations and their personnel in order to achieve their objectives.

Article 105 of the United Nations Charter and the implementing statutes represented by the International Organizations Immunities Act of 1945 and the Headquarters Agreement of 1947 are the specific legal expression and concrete projection of that process in action.

The United Nations Charter, the federal statutes, the Common Law of Nations have been given a broad and liberal application by the Court in this case. See Barnes, Diplomatic Immunity From Local Jurisdiction: Its Historical Development Under International Law and Application in United States Practice, The Department of State Bulletin, vol. XLIII, No. 1101 (August 1, 1960) 173, 182; Jenks, Craftsmanship In International Law, 50 A.J.I.L. 32, 60 (1956).

Despite that latitudinarian interpretation, the Court must conclude that the applicable provisions of law do not confer immunity upon the defendant Melekh with respect to the acts charged in the indictment. His claim of immunity is overruled and rejected.

Jurisdiction over the defendant Melekh and the co-defendant Hirsch and the subject-matter of these proceedings is vested in this Court.

Both defendants are ordered removed to the Northern District of Illinois.

Submit order on notice.