# Presidential Power Concerning Diplomatic Agents and Staff of the Iranian Mission

While there is authority for imposing some travel restrictions on Iranian diplomatic personnel under the Vienna Convention on Diplomatic Relations and customary international law, as well as under domestic law, those sources of law generally state that diplomats may not be placed in circumstances tantamount to house arrest, or barred from leaving the country, even as an act of reprisal for breaches of diplomatic immunity by Iran.

Subjecting Iranian diplomatic personnel to prosecution under the criminal provisions of the International Emergency Economic Powers Act, even if done in reprisal for Iranian breaches of international law and accompanied by all applicable protections afforded by the United States Constitution, would raise serious questions under international law.

January 8, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

On November 14, 1979, you asked this Office to review certain questions relating to the situation in Iran, and during the last few weeks we have provided you our views on a number of these questions orally. In this memorandum we summarize the central legal issues involved in taking actions against Iranian diplomatic personnel in this country, and set forth our reasoning and conclusions. We address, principally, the following questions:

1) May the President restrict the movement of Iranian diplomatic agents and staff personnel within the United States, including, if necessary, confinement to embassy grounds;
2) May he prevent these persons from departing the country;
3) May he subject these persons to prosecution for violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1705?

We conclude that although the President may possess constitutional and statutory power to take any or all of these actions, each of them raises serious international law questions.

### I. Restricting the Movement of Members of the Iranian Mission

*A. International Law*

The rights of diplomatic personnel are governed by the Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227,

174

T.I.A.S. No. 7502, ratified by Iran, the United States, and all major countries of the world. Any doubts that may have existed concerning whether the Treaty automatically became part of our domestic law upon its ratification have been removed by the recent passage of the Diplomatic Relations Act, 22 U.S.C. §§ 254a–256, a major purpose of which was to codify the Convention's immunity provisions as part of our law. *See generally* S. Rep. No. 958, 95th Cong., 2d Sess. (1978).

As an introductory matter, the Convention and the Act establish categories of diplomatic personnel, and grant them varying degrees of immunity. Under Articles 1, 31, and 37 of the Convention and 22 U.S.C. §§ 254a and 254d, diplomatic agents and their families enjoy complete criminal immunity and nearly complete civil immunity. Members of the administrative and technical staff and their families enjoy complete criminal immunity and civil immunity for acts in the course of their duties. Service staff of the mission enjoy immunity for acts performed in the course of their duties. The Act implements these immunities by providing that actions brought against individuals who are entitled to immunity in respect to them under the Convention or the Act shall be dismissed (§ 254d).

The Convention has a number of substantive provisions that are relevant here. First, Article 22 provides unconditionally that the premises of the mission shall be inviolable, and places a special duty on the receiving state to protect the premises against intrusion and to refrain from searching it. Iran is clearly in massive breach of this Article.[1]

Article 26 requires the receiving state to guarantee members of the mission[2] freedom of movement in the country, subject to regulations establishing national security zones. This Article was adopted against a background of longstanding travel restrictions imposed by nations on a reciprocal basis. (For example, after World War II the Soviet Union limited travel by members of diplomatic missions in Moscow to 50 kilometers from the capital, absent special permission. The United States and others retaliated by imposing reciprocal restrictions on the Soviet Union and other offending nations.) An amendment to the Article that would have stated that prohibited zones must not be so extensive as to render freedom of movement illusory failed of passage. This does not constitute an affirmative endorsement of highly restrictive travel zones, however, since a statement to the same effect as the failed amendment was already in the commentary to the Article. At any rate, travel restrictions have continued on a more or less restrictive basis since adoption of the Convention. *See generally* E. Denza, Diplomatic

---

[1] The United States could confine members of the Iranian Mission to the premises without violating this Article, although such an action could violate Article 29's prohibition of arrest.

[2] Under 22 U.S.C. § 254a, the term "members of a mission" includes diplomatic agents, administrative and technical staff, and service staff, as defined in Article 1 of the Convention.

Law, Commentary on the Vienna Convention on Diplomatic Relations, 115–18 (1976).

Our own legislative history of the Convention suggests that "protective custody" of diplomatic personnel could be justified under Articles 26 and 29. The State Department's Legal Adviser testified before the Senate Foreign Relations Committee that these provisions could be used in situations involving armed conflict to justify placing diplomats in protective custody. He pointed out that while Article 29 prohibits arrest, it also provides that the receiving state shall take appropriate steps to prevent attacks on a diplomat's person. 7 M. Whiteman, Digest of Int'l Law 442 (1970).

This argument, however, is subject to two rejoinders. First, reconciling Article 26, allowing travel restrictions, with Article 29, forbidding arrest, requires a legal and practical distinction at some point between travel restrictions and arrest. The practice of travel restrictions against which the Convention was drafted had never reached the level of house arrest. Second, in the Convention the United States opposed a provision now found in Article 39.2, stating that immunities such as those against arrest continue even in case of war. We argued that it was necessary to intern enemy diplomats at the outbreak of war, citing the World War II experience. We proposed an amendment that failed, which would have allowed the receiving state in time of national emergency, civil strife, or armed conflict to institute appropriate measures of control of mission personnel and their property, including protective custody to insure their safety. *See* 7 M. Whiteman, *supra*, at 441. The history of the failed American amendment is ambiguous enough that it does not necessarily preclude limited imposition of protective custody relying directly on the duty in Article 29 to "take all appropriate steps to prevent any attack on" a diplomat's person, but a protective custody theory would be very hard to reconcile with an accompanying ban on departure from the country. Indeed, Article 44 provides that even in case of armed conflict, the receiving state must allow mission personnel an opportunity to leave the country at the earliest possible moment. In short, house arrest of mission personnel accompanied by a ban on their return to Iran cannot fairly be argued to be within the substantive terms of the Convention.

Article 47 of the Convention provides that a state may discriminate against another state by applying any of the provisions of the Convention restrictively "because of a restrictive application of that provision to its Mission in the sending state." The background to this provision indicates that it authorizes reciprocally unfavorable treatment only to an extent that is not clearly contrary to the terms of the Convention. Denza, *supra*, at 283–84. This means that relatively restrictive travel zones imposed by another country would allow us to impose restrictive

travel zones on a reciprocal basis, but would not justify our breach of the Convention, for example by invading their mission.

The Convention's preamble affirms "that the rules of customary international law should continue to govern questions not expressly regulated" by its provisions. Customary international law allows reprisals, which are breaches of a treaty's terms in response to a breach by another party. To be legal, reprisals must respond in a proportionate manner to a preceding illegal act by the party against whom they are taken. *See* G. Schwarzenberger, A Manual of International Law 184 (5th ed. 1967).[3] Identical reprisals are the easiest to justify as proportionate, because subjective comparisons are not involved. Thus, in the current crisis, the taking of Iranian diplomats as "hostages" (or a lesser restriction on their freedom of movement that approaches imprisonment) would clearly be a proportionate response; reducing the immunity of Iranian diplomats from criminal prosecution would be more difficult to justify.

At this point a special difficulty arises. International law scholars have identified an exception to the law of reprisals: "diplomatic envoys may not be made the object of reprisals, although this has occasionally been done in practice." H. Lauterpacht, 2 Oppenheim's *International Law* 140 (7th ed. 1952), citing Grotius. Customary international law often has no firmer basis than the opinions of the scholars, bolstered by their own reputations and the precedent they can summon. This exception to the reprisals doctrine can claim the support of some highly reputable scholars.

It is unclear whether this exception is meant to refer only to the illegality of taking reprisals against diplomats in response to unrelated breaches by the sending state (e.g., a blockade), or whether it is meant to extend to a ban on reprisals against diplomats even when the sending state commits a breach of diplomatic immunity. The former interpretation has the evident merit of preventing routine harassment of diplomats, and would leave a role for reprisals in such extreme circumstances as the present Iranian actions.

Nevertheless, the exception is stated in terms suggesting that reprisals against diplomats are never legal. As a result, if the United States were to take action amounting to a breach of the Vienna Convention, such as arresting Iranian diplomats or barring their departure from the country, a reputable argument could be made that our action was illegal, despite major previous breaches by the other side. Here it can be argued that Article 47 of the Vienna Convention means to forbid full-scale reprisals against diplomats, no matter the provocation. It would be pointed out

---

[3] This principle is also codified in the Vienna Convention on the Law of Treaties, Article 60, Senate Exec. L., 92d Cong., 1st Sess. (1971), which allows suspending the operation of a treaty in whole or in part upon the material breach of another party, but which is not yet in force and has not been ratified by the United States.

177

that economic reprisals (blocking assets, boycotts, or even blockade) stand as substitute remedies.

There may be added support for the view that reprisals against diplomats are never legal in the World Court's recent order granting an "indication of Provisional Measures" in *United States of America* v. *Iran.* For the Court ordered release of the hostages, including diplomatic personnel, despite Iran's argument that the hostage-taking should be viewed as "secondary" to "25 years of continual interference by the United States in the internal affairs of Iran, . . . and numerous crimes perpetrated against the Iranian people, contrary to . . . all international and humanitarian norms." The seriousness of these allegations did not convince the Court that imprisoning diplomats was a fit reprisal. Still, the Iranian action was not presented as a reprisal for breaches of diplomatic immunity, and the Court did not speak to that issue. It ordered release "in accordance with the treaties in force between the two States, and with general international law."

In any event, it is our judgment that international law casts considerable doubt on the legality of any reprisal against diplomats.

## B. Domestic Law Implementing International Law

It seems clear that the Vienna Convention and surrounding principles of customary international law have been incorporated as part of our domestic law. First, Article VI of the Constitution makes treaties part of the supreme law of the land, along with the Constitution and statutes. The Vienna Convention, ratified by the United States, includes an affirmation in its preamble that rules of customary law should govern questions not expressly regulated by the terms of the Convention.

Moreover, the Supreme Court has recognized customary international law as part of our domestic law. *See* L. Henkin, Foreign Affairs and the Constitution 221 (1972). In *The Paquete Habana,* 175 U.S. 677, 700 (1900), the Supreme Court held that under international law, fishing vessels belonging to enemy nationals were exempt from capture and condemnation by American vessels:

> International law is part of our law, and it must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.

A principal purpose of the Diplomatic Relations Act of 1978, 22 U.S.C. § 254a *et seq.,* was to "codify the privileges and immunities provisions of the Vienna Convention as the sole United States law on the subject," S. Rep. No. 958, *supra,* at 1, and to repeal inconsistent statutes. The Act also provides, in § 254c:

178

The President may, on the basis of reciprocity and under such terms and conditions as he may determine, specify privileges and immunities for members of the mission, their families, and the diplomatic couriers of any sending state which result in more favorable treatment or less favorable treatment than is provided under the Vienna Convention.

The Report of the Senate Foreign Relations Committee, No. 958, *supra,* at 5, explains that this provision "reflects article 47 of the Convention which allows such treatment." The Report goes on:

The conditions under which U.S. diplomatic personnel carry out their official functions and lead their lives in certain hardship areas dictate their enjoyment of increased protection from harassment as a result of arbitrary application of local law. This provision permits less favorable treatment than the Vienna Convention and covers those cases where certain nations restrict the privileges and immunities of U.S. diplomatic personnel abroad. Any use of the discretion described in this section must be on a reciprocal basis with the nations involved.

It is unclear whether this section means to go further than to codify Article 47 of the Convention, which allows only restrictive applications of the Convention's terms. It can be read to provide domestic authority to exercise the international law of reprisals, which would, however, presumably include the exception for reprisals against diplomats. The legislative history is barren of guidance except for the discussion quoted above, which refers to Article 47 and which seems to contemplate reciprocally restrictive travel provisions.

There is explicit authority for travel regulations in the Foreign Relations Authorization Act of 1979; Pub. L. No. 95–426, 22 U.S.C. § 2691 note:

For the purpose of implementing general principles of the Final Act of the Conference on Security and Cooperation in Europe (signed at Helsinki on August 1, 1975) emphasizing the lowering of international barriers to the free movement of people and ideas and in accordance with provisions of the Vienna Convention on Diplomatic Relations establishing the legal principles of nondiscrimination and reciprocity, it shall be the general policy of the United States to impose restrictions on travel within the United States by citizens of another country only when the government of that country imposes restrictions on travel by United States citizens within that country.

The legislative history of this provision refers to it as "self-explanatory," and is otherwise unilluminating. H.R. Rep. No. 1160, 95th Cong., 2d Sess. (1978).

Thus there is ample international and domestic authority for travel restrictions on Iranian diplomatic personnel. But the line must be drawn at that point—anything amounting in substance to holding them hostage would entail a possible breach of international law. Instead, the traditional remedy against diplomats has been to declare them *persona non grata* and to expel them, even in cases of espionage.[4] There is even a possibility that internment of Iranian diplomatic personnel would run afoul of 18 U.S.C. § 112, which makes it a federal crime to assault or imprison a foreign diplomat. This provision, passed in response to terrorism at the Munich Olympics and elsewhere, focuses on ordinary criminal activity, but it is not in terms inapplicable to governmental abuse of diplomatic privileges and immunities.

## C. Presidential Power Over Diplomatic Personnel

The President's authority over foreign diplomatic personnel derives from his constitutional power in Article II to "receive Ambassadors and other Public Ministers." From this derives the President's power to grant or withdraw recognition to foreign governments and their ministers, a power regarded as textually committed to the Executive alone. *See Jones* v. *United States,* 137 U.S. 202, 212 (1890); *Baker* v. *Carr,* 369 U.S. 186, 212–13 (1962); *see generally* 2 B. Schwartz, The Powers of the President 104–09 (1963). The President's well-established power to recognize foreign governments without the participation of the other branches is a greater power than that involved in receiving a particular Ambassador of a recognized government, although it may flow logically enough from that power. As a consequence, the President's power to accept or reject a particular envoy has been beyond serious question since President Washington demanded the recall of Citizen Genet, the French Minister. As early as 1855, the Attorney General gave an opinion that the right of reception extends to "all possible diplomatic agents which any foreign power may accredit to the United States," 7 Op. Att'y Gen. 186, 209 (1855).

The legal status of foreign diplomatic personnel in the United States has its roots in these constitutional considerations and was well-defined long before the Vienna Convention codified it. In effect, persons with full diplomatic status bear the same relation to the United States as the government they serve; they are not subject to domestic law, and our rights and remedies with respect to them are diplomatic only. *See*

---

[4] This is not the case for individuals with only a qualified immunity from criminal jurisdiction. The United States does not recognize violation of the espionage laws as part of a foreign employee's official function, and the limited immunity is no bar to prosecution for such violations. *See United States* v. *Egorov,* 222 F. Supp. 106, 107–08 (E.D.N.Y. 1963); *United States* v. *Melekh,* 190 F. Supp. 67, 87–89 (S.D. N.Y. 1960).

*Schooner Exchange* v. *McFaddon,* 11 U.S. (7 Cranch) 116, 138–39 (1812) (Marshall, Ch. J.), for a classic statement of this. The first American statutes granting immunity from our domestic law to diplomatic personnel date from 1790, and since the Citizen Genet affair, Presidents have declared foreign diplomatic personnel *persona non grata,* expelling them without explanation or process. Neither expulsion without procedural protections nor travel restrictions of the sort familiar both before and after ratification of the Vienna Convention would be tolerable for American citizens or nondiplomatic aliens. Professor Henkin concludes that "foreign governments, however, and probably foreign diplomats in their official capacity, have no constitutional rights, and there are no constitutional obstacles, say, to tapping wires of foreign embassies." Henkin, *supra,* at 254. (Professor Henkin's example regarding wiretapping presages a position taken by the Office of Legal Counsel in response to a request of the Permanent Select Committee on Intelligence in April, 1978.)

At the same time, aliens within our international jurisdiction are subject to our laws and are entitled to claim constitutional protections when the government has not granted them immunity. *See Mathews* v. *Diaz,* 426 U.S. 67, 77 (1976); *Wong Wing* v. *United States,* 163 U.S. 228, 237–38 (1896).

A consistent pattern emerges from these authorities. Diplomatic personnel, standing as surrogates for the nation they represent, are without the constraints of our domestic law and its protections as well. For example, no one would suggest that a diplomat has a First Amendment right to disparage the President without suffering expulsion as a consequence. But to the extent that immunity does not hold, with the exposure to our domestic law comes equally an opportunity to take advantage of its protections. Thus, no one would suggest that an alien may be tried for espionage without the observance of due process guarantees. *See Abel* v. *United States,* 362 U.S. 217 (1960).

In addition to these constitutional sources, the President can draw authority over diplomats from the provisions of the Diplomatic Relations Act and the Foreign Relations Authorization Act that are summarized above. Finally, there is a little-known 1868 statute, now 22 U.S.C. § 1732:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship . . . , the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate

181

the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

This provision appears never to have been invoked; at least it has never been relied on in litigation to support presidential action. It was passed in response to a dispute with Great Britain after the Civil War, in which that nation was trying its former subjects, who had become naturalized Americans, for treason. A rejected amendment to the bill would have authorized the President to suspend all commerce with the offending nation, and to round up foreign citizens found in this country as hostages; even this harsh provision, however, excepted diplomatic personnel. Cong. Globe, 40th Cong., 2d Sess. 4205, 4445 (1868). Therefore, if this provision is to be relied on, it should be invoked for actions not involving diplomats.

In conclusion, the President has plenary powers to control the presence and movement in this country of foreign diplomatic personnel, short of violations of international law.

## II. Departure Controls

The Immigration and Nationality Act, 8 U.S.C. § 1185(a), provides

Unless otherwise ordered by the President, it shall be unlawful—

(1) for any alien to depart from . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe. . . .

It is clear from the structure of the statute that the term "alien" as used in § 1185 includes diplomatic personnel. The definitions section of the Act, § 1101(a), defines alien as any person not a citizen of the United States (3), and includes diplomatic personnel among nonimmigrant aliens (15). Section 1102 of the Act makes the provisions on exclusion or deportation inapplicable to diplomatic personnel, except as otherwise provided. There is no parallel section exempting diplomatic personnel from departure controls.

Regulations implementing § 1185 have been issued by the Department of State, but are implemented by the departure control officers of the Immigration and Naturalization Service (INS). 22 C.F.R. § 46. The regulations provide in § 46.2 that no alien (defined in the statute's terms) shall depart, or attempt to depart, from the United States if his departure would be prejudicial to the interests of the United States under the provisions of § 46.3. Departure control officers, having reason to believe that § 46.3 applies, are instructed to serve the alien with a written temporary order directing him not to depart. In turn, § 46.3 defines categories of aliens whose departure shall be deemed prejudicial to the

interests of the United States, and includes: fugitives from justice; aliens needed as witnesses or parties to criminal cases under investigation or pending in our courts; aliens needed in connection with investigations or proceedings being conducted by any official executive, legislative, or judicial agency in the United States; and aliens who may disclose defense information, engage in activities impeding our national defense, wage war against the United States, or help to deprive the United States of sources of supplies or materials vital to our national defense. There is also a final catchall category (k) for any alien whose case does not fall within any of the specified categories, "but which involves circumstances of a similar character rendering the alien's departure prejudicial to the interests of the United States." Any of a number of these provisions would seem adaptable to the present situation.

Section 46.7 of the regulations provides that in the absence of appropriate instructions from the State Department's Bureau of Security and Consular Affairs, departure control officers shall not exercise their authority to bar exit in the case of aliens seeking to depart in the status of diplomatic personnel (within a definition in § 1101(a)(15) that closely resembles those in the Diplomatic Relations Act). It goes on to provide, however, that in "cases of extreme urgency, where the national security so requires," a departure control officer may preliminarily exercise authority to bar exit pending the outcome of consultation with the Administrator, "which shall be undertaken immediately. In all cases arising under this section, the decision of the Administrator shall be controlling: *Provided,* That any decision to prevent the departure of an alien shall be based upon a hearing and record as prescribed in this part." The regulations provide that an alien served with a notice of temporary prevention of departure may within 15 days request a hearing before a Special Inquiry Officer of the INS. If a hearing is requested, the alien is entitled to appear, to be represented by counsel of his choice, and to have a trial-type hearing. The Special Inquiry Officer recommends disposition, and the record and any written appeals are transmitted to the Regional Commissioner, whose decision is administratively final.

### III. Restricting Criminal Immunity of Diplomatic Personnel

Under the Vienna Convention, diplomatic agents and administrative and technical staff are entitled to complete immunity from the criminal jurisdiction of the host state. However, the exercise of criminal jurisdiction over foreign diplomatic personnel might, as a matter of international law, be justified as a reprisal for Iranian breaches of the Convention. As noted above, there is a substantial argument that all reprisals against diplomatic personnel are illegal.[5] Moreover, reprisals become

---

[5] Support for such an argument in this application might be found in the World Court's order to Iran to afford our diplomats "immunity from any form of criminal jurisdiction."

more difficult to justify as they become less clearly reciprocal in terms of nature or severity to the breach that has occurred. *See* Schwarzenberger, *supra,* at 184. Thus, house arrest of Iranian diplomats, because of its similarity to the imprisonment of our personnel, is easier to justify than criminal prosecution of a sort not yet imposed upon our hostages. There is also a serious danger that a reprisal of this sort might be thought to justify the exercise of Iranian criminal jurisdiction, in particular regarding espionage, over our personnel. Therefore, if any criminal jurisdiction is asserted over Iranian diplomatic personnel, it is particularly important to specify the aspects of the criminal law to which they are being subjected. This could be done by notification that violations of Executive Order No. 12,170 and the criminal provisions of the IEEPA, 50 U.S.C. § 1705, will result in criminal prosecution.

Moreover, as a matter of American constitutional law, it is clear from the preceding analysis that Iranian personnel subjected to criminal prosecution would be entitled to due process protections. Before encountering criminal liability, they would need to be placed on notice that we regard their conduct as subject to our domestic criminal law, in particular the provisions of the IEEPA.

Although there is some basis in law for subjecting Iranian diplomatic personnel to our criminal statute enforcing the freeze order, assertion of our criminal jurisdiction over these persons is fraught with danger. Moreover, since the existence of the freeze should prevent those dealing with the affected governmental instrumentalities from distributing property to them, it is not apparent that serious violations are likely to occur. We urge strongly against any formal assertion that Iranian diplomatic personnel are subject to this aspect of our criminal law.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*